**FIRST DIVISION**
June 25, 2008

No. 1-04-1311

| | | |
|---|---|---|
| MARY WILLABY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 99 l 6981 |
| CLARA BENDERSKY, HASMUKH PATEL, | ) | |
| and WESTLAKE COMMUNITY HOSPITAL, | ) | |
| | ) | The Honorable |
| Defendants-Appellants. | ) | John E. Morrissey, |
| | ) | Judge Presiding. |

JUSTICE GARCIA delivered the opinion of the court.

Mary Willaby, filed suit against Dr. Clara Bendersky, Dr. Hasmukh Patel, and Westlake Community Hospital, alleging medical negligence. A laparotomy sponge was left in Willaby's abdomen following surgery to repair an evisceration that occurred subsequent to a hysterectomy. The matter proceeded to a jury trial. At the close of all of the evidence, the trial court granted Westlake's motion for a directed verdict, and the jury subsequently returned a verdict in favor of Drs. Bendersky and Patel. Willaby raises several issues on appeal, including (1) Dr.

No. 1-04-1311

Patel's closing argument denied her a fair trial, (2) the trial court erred in striking the testimony of her nursing expert and granting Westlake's motion for a directed verdict, and (3) the jury's verdict is against the manifest weight of the evidence. For the reasons that follow, we affirm in part, reverse in part, and remand the matter to the circuit court for a new trial against Westlake only.

BACKGROUND

In 1997, Mary Willaby began experiencing abdominal pain. Willaby, who was 50 years old and obese, saw her doctor, Dr. Miller, who diagnosed her with having fibroid tumors in her uterus. Dr. Miller referred Willaby to the defendant Dr. Bendersky, a board-certified gynecologist and obstetrician. Dr. Bendersky recommended a total abdominal hysterectomy and bilateral salpingo-oopherectomy, the removal of both of Willaby's fallopian tubes and her uterus.

Dr. Bendersky performed the hysterectomy on June 16, 1997, at Westlake. When Dr. Bendersky closed Willaby's abdomen, she did not notice any "intestinal adhesions"--portions of Willaby's bowels that were stuck together. Willaby stayed at Westlake for several days recovering. During this time, Willaby's white blood cell count rose and she had a fever. She also experienced

2

serosanguinous drainage, a drainage consisting of blood mixed with peritoneal fluid, from the surgery wound site. Willaby was discharged from Westlake on June 20.

Following her discharge, Willaby experienced abdominal pain and bouts of projectile vomiting. She called Dr. Bendersky, who advised her to go to the Westlake emergency room. On June 21, 1997, Willaby was readmitted to Westlake and was referred to the defendant Dr. Patel, a board-certified general surgeon. Dr. Patel believed Willaby was suffering from either a bowel obstruction or a paralytic ileus, a condition commonly seen following hysterectomies where movements in the bowel slow.

Although Dr. Patel considered operating on Willaby, he opted not to because her condition appeared to be resolving. Dr. Bendersky ordered a cystogram to determine whether Willaby's bladder had been injured during the hysterectomy. The cystogram came back negative. A nursing note in Willaby's chart indicated the presence of serosanguinous drainage from the surgical wound and questioned whether Willaby's wound had become infected.

On June 30, 1997, Dr. Miller discharged Willaby. Before she left Westlake, Dr. Bendersky removed the skin staples from Willaby's hysterectomy wound and covered the wound with a bandage. Shortly after her staples were removed, and before she left Westlake, Willaby suffered a wound dehiscence, meaning the layers

3

of her abdominal wall at the surgical site separated. Willaby then suffered an evisceration, a dangerous condition where her intestines emerged outside of her abdominal cavity through the wound dehiscence. Willaby was able to catch her intestines before they spilled onto the floor. She called for help and several nurses and a doctor responded. The doctor, who is unidentified in the record, was able to massage Willaby's intestines back into her abdomen. The doctor then applied an abdominal binder. Willaby was rushed to surgery with Dr. Patel.

When Dr. Patel opened Willaby's abdomen, he noticed she had several adhesions--areas where her intestine was either stuck together or stuck to another organ. Dr. Patel also noticed that an internal suture from her hysterectomy wound was "stuck" to the peritoneum, the inner lining of Willaby's abdominal wall. Dr. Patel cut the suture to release it from the abdominal wall and freed the intestine from the stitch. Dr. Patel then brought out all of Willaby's intestines to examine them. A 12-inch portion of Willaby's small intestine was twisted and was not receiving blood. Dr. Patel removed this portion of the intestine and reconnected the healthy portions of the bowel. Because Willaby's appendix looked abnormal, Dr. Patel removed it. Subsequent pathological testing, however, revealed that Willaby's appendix was normal.

Before Dr. Patel closed Willaby's abdomen, he was assured by

**4**

the nurses in the operating room that all laparotomy sponges and other instruments used in the surgery were accounted for. Dr. Patel closed Willaby's abdomen. However, unbeknownst to Dr. Patel, a 12-inch by 12-inch laparotomy sponge remained in Willaby's abdominal wall.

The sponge, like all laparotomy sponges, contained a radiopaque tail making it detectable by X-ray. Dr. Patel ordered an X-ray of Willaby on July 6, 1997, "to see how the intestines were looking." The X-ray indicated the presence of a foreign object, which was determined to be a surgical drain. Dr. Patel was aware a surgical drain had not been placed in Willaby's abdomen. However, he did not see the X-ray report until November 1997. By that time, Willaby had returned to Dr. Miller complaining of nausea and leakage from her navel. Dr. Miller ordered a CAT scan, which indicated the presence of a foreign object. On December 1, 1997, Dr. Patel performed exploratory surgery on Willaby and discovered the laparotomy sponge.

Willaby filed a medical negligence suit against Dr. Bendersky, Dr. Patel, and Westlake. On November 6, 2003, the date trial was set to commence, Willaby filed a motion for summary judgment, claiming there was no factual dispute that (1) Dr. Bendersky placed a suture through Willaby's bowel, (2) Dr. Patel allowed a sponge to remain in Willaby's abdomen, and (3) Westlake failed to comply with

5

its procedures and protocols to ensure a proper sponge count was achieved and failed to conduct a sponge count after the June 30, 1997, surgery. Willaby also filed a "Motion for Ruling on Res [Ipsa] Loquitur," in which she asked the court "for a ruling granting the applicability of the doctrine of res ipsa loquitur" in regard to Dr. Bendersky, Dr. Patel, and Westlake.

The trial court denied Willaby's summary judgment motion, finding it untimely. No ruling on the res ipsa loquitur motion appears in the record. The trial court also granted several motions in limine, including one filed by Dr. Patel seeking to bar any reference to the parties' finances. On November 14, 2003, a jury trial began.

## I. Dr. Bendersky

Willaby sought to prove at trial that Dr. Bendersky, when performing the hysterectomy, negligently placed a suture through her bowel, which became infected and led to the wound dehiscence and evisceration. According to this theory, Dr. Bendersky and Dr. Patel should have recognized the rise in her white blood cell count, her fever, and the serosanguinous drainage as signs of an infection and a pending wound dehiscence and evisceration. Willaby claimed, however, they negligently failed to respond to those signs.

To support this theory, Willaby called Dr. Bendersky to

testify as an adverse witness. Dr. Bendersky acknowledged the rise in white blood cell count and temperature, but testified she was not concerned because they normally rise following surgery. Dr. Bendersky was not concerned with the serosanguinous drainage because its appearance was not purulent, or pus-like. Dr. Bendersky also testified that she did not place a stitch through Willaby's bowel during the hysterectomy.

Willaby also called Dr. Patel to testify as an adverse witness. According to Dr. Patel, Willaby did not exhibit any signs of a wound dehiscence, such as a wound infection or increased abdominal pressure. Dr. Patel was not concerned with the serosanguinous drainage because it commonly occurs in obese patients as fat drains out of the wound. Dr. Patel testified that the wound dehiscence and evisceration were likely caused by coughing. According to Dr. Patel, a nurse told him Willaby sat up in bed and coughed prior to the wound dehiscence and evisceration.

Dr. Patel acknowledged that during the evisceration repair surgery, he noticed that Willaby's bowel had several adhesions. Although adhesions can be an indication of an infection, they are commonly seen after surgery and can occur for unknown reasons. In Dr. Patel's opinion, Willaby did not have any kind of wound or abdominal infection during her entire hospitalization.

Willaby presented expert testimony from Dr. Melvin Gerbie, a board-certified obstetrician-gynecologist, and Dr. Rogelio Riera, a retired general surgeon. Dr. Gerbie testified Dr. Bendersky failed to identify and act upon Willaby's symptoms, especially the serosanguinous drainage, indicating a pending wound dehiscence and evisceration. Dr. Riera testified that both Dr. Bendersky and Dr. Patel deviated from the standard of care when they failed to "explore" Willaby's surgical wound by opening it and draining it prior to the evisceration. It was the opinion of Dr. Gerbie and Dr. Riera that an errant stitch through Willaby's bowel caused an infection that ultimately caused the wound dehiscence and evisceration. Dr. Gerbie did not believe the wound dehiscence and evisceration was caused by coughing.

Dr. Gerbie acknowledged that wound dehiscence is often associated with obesity, in part because of the increased intra-abdominal pressure put on the incision. He also testified that suturing a bowel was not necessarily a deviation of the standard of care.

Dr. Bendersky presented expert testimony from Dr. Lance Mercer, a board-certified obstetrician-gynecologist. It was Dr. Mercer's opinion that Dr. Bendersky did not place a stitch through Willaby's bowel. However, even if she did place such a stitch, it would not be a deviation of the standard of care.

Dr. Mercer also explained that pus, not serosanguinous drainage, is indicative of an infection. Serosanguinous drainage could be indicative of a wound dehiscence and evisceration if it is "copious," meaning it continues to pour out of the patient. In his view, Willaby's drainage was not copious. Rather, some amount of drainage would be expected in an overweight patient with a long incision. Dr. Mercer disagreed with Dr. Gerbie's opinion that the presence of serosanguinous drainage required an exploration of the wound.

Dr. Mercer did not know what caused Willaby's wound dehiscence and evisceration, but opined Willaby's obesity was a factor. He did not believe an infection was the cause. He also did not believe the removal of Willaby's staples played any role in the wound dehiscence and evisceration.

Dr. Richard Jorgenson, a board-certified general surgeon, gave expert testimony on behalf of Dr. Patel. Dr. Jorgenson explained that an evisceration is "a sudden monumental event" that cannot be anticipated. Dr. Jorgenson did not find the serosanguinous drainage, the elevated white blood cell count or the fever to indicate a pending wound dehiscence and evisceration. A fever and an elevated white blood cell count are both nonspecific findings. Further, instances of serosanguinous drainage will usually heal themselves. Dr. Jorgenson also testified that exploring the wound

prior to June 30, 1997, would not have prevented the wound dehiscence and evisceration and could have possibly exposed the wound to an infection. In Dr. Jorgenson's opinion, Willaby's wound dehiscence and evisceration occurred because she had weak tissue. Her obesity was also a contributing factor, as obesity leads to healing difficulties. According to Dr. Jorgenson, Dr. Patel's treatment before and after the wound dehiscence and evisceration complied with the standard of care.

## II. Dr. Patel

Willaby sought to prove at trial that Dr. Patel, as the surgeon in charge of the evisceration repair, was responsible for the sponge being left in her abdomen and that he acted negligently when he removed Willaby's normal appendix.

Dr. Patel testified it was his responsibility as a surgeon to make sure that all sponges are removed from a patient's body before closing the patient. He also admitted that only he had the ability to put a sponge in a patient and remove it. Dr. Patel was not concerned that a sponge had been left in Willaby because the nurses reported the sponge count as correct.

Dr. Gerbie acknowledged that in some situations, such as in an emergency, a sponge may be left in a patient without any negligence on the part of healthcare providers. However, in this case, Willaby's wound dehiscence and evisceration ceased to be an

**10**

emergency once her bowel was resected. Dr. Gerbie and Dr. Riera both testified Dr. Patel deviated from the standard of care in leaving the sponge behind. Dr. Riera, however, agreed that it was within the standard of care for Dr. Patel to rely on a sponge count as communicated by the nurses. Dr. Riera also testified it was improper for a doctor to remove a healthy organ without the patient's consent.

According to Dr. Jorgenson, leaving the sponge behind was not a deviation of the standard of care because the evisceration repair surgery was an emergency. He also testified that it was within the standard of care for Dr. Patel to rely on the sponge count as communicated by the nurses. Dr. Jorgenson also explained that the appendix serves no purpose in the body. He testified it was common practice to remove an abnormal looking appendix because leaving it in can be fatal. He also explained there is no way to perform a biopsy on an appendix during an operation.

### III.  Westlake

The theory Willaby sought to prove against Westlake was that the nurses were negligent in failing to perform an accurate sponge count.

Testimony from Westlake nurses Mary George, Donna Leder, and Mercedes Fitzgerald established that except in emergency cases, Westlake's nursing policy requires nurses to count all sponges at

least three times: an initial count taken prior to the surgery; a first count taken during surgery when the first layer of the abdominal wall is closed; a final count taken when the final layer of the abdominal wall is closed. An interim count is required to be taken when a nursing shift change occurs during surgery. This count is not necessarily accurate because sponges may have placed in the patient's body and the surgeon cannot be expected to remove them so they can be counted.

Each count of the sponges involves two nurses. For the initial count, the "scrub nurse" unwraps each sponge from its packaging and counts each aloud. The scrub nurse also checks that each sponge has a radiopaque tail. The "circulating nurse" records the number of sponges unwrapped on a "count sheet." The count totals from the subsequent counts are then matched against the initial count.

The count sheet, however, is only "temporary," meaning it does not become part of the patient's medical chart. An "intraoperative report," which contains the nurses' signatures indicating the counts taken are correct, is kept in a patient's chart. The intraoperative report, however, does not indicate the actual number of sponges used.

Nurse George was the scrub nurse for Willaby's hysterectomy surgery. At trial, Nurse George identified the intraoperative

**12**

report from that surgery. The report was signed, indicating the first and final counts matched the initial count.

Nurse Leder was a scrub nurse for Willaby's evisceration repair surgery. At trial, Nurse Leder identified the intraoperative report from that surgery, which indicated the counts were done and were accurate. She also testified she was relieved by Nurse Mercedes Fitzgerald in the middle of the surgery.

Nurse Fitzgerald testified she followed Westlake's sponge-counting procedures during Willaby's evisceration repair surgery. Fitzgerald also identified Willaby's intraoperative report where her signature indicated the first and final counts were taken, and that they matched the initial count. According to Fitzgerald, her count was correct.

Willaby also presented expert testimony from Nurse Lutricia Cloud, who testified the Westlake nurses deviated from the standard of care by failing to maintain an accurate sponge count, by failing to follow nursing and hospital protocol regarding counting sponges, and by failing to advise Dr. Patel they did not have an accurate sponge count. Nurse Cloud defined the standard of care as "the best possible care for patients which prevents or avoids causing them any harm."

Westlake presented expert testimony from Nurse William Culver. Nurse Culver testified that Westlake's sponge-counting policy

**13**

complied with the standard of care and that the nurses complied with the policy during Willaby's evisceration repair surgery. Nurse Culver defined the standard of care as "what a reasonably qualified registered nurse would do in the same or similar situation."

After the presentation of evidence concluded, Willaby sought leave to file a first-amended complaint to conform the pleadings to the proofs and to add a res ipsa loquitur count against Dr. Patel. The trial court allowed the motion.

The court next considered a motion filed by Westlake to strike Nurse Cloud's testimony on the basis that she failed to properly identify the standard of care. The trial court granted the motion, stating,

> "Looking at Nurse Cloud's testimony in its best light, Nurse Cloud never stated that she was familiar with the applicable standard of care for nurses practicing in the Chicagoland area.
>
> * * *
>
> Were I to allow her testimony to go to the jury in the manner and form that it was offered, the jury would be called upon to apply an incorrect standard of care for nurses

**14**

> based solely on Cloud's testimony. And Cloud
> is the only one called by the plaintiff who
> directly criticizes the nurses."

Based on the striking of Nurse Cloud's testimony by the trial court, Westlake filed a motion for a directed verdict. The trial court granted the motion "due to the insufficiency of Nurse Cloud's testimony as a matter of law."

### IV. Verdict

The jury returned a verdict in favor of Drs. Patel and Bendersky. Willaby's posttrial motion was denied, and this timely appeal followed.

### ANALYSIS

Before addressing the issues properly before us, we make two observations. First, Willaby challenges several of the trial court's rulings, including allowing certain testimony that amounted to hearsay, allowing certain testimony that should have been barred by Supreme Court Rule 213 (210 Ill. 2d R. 213), and rejecting a certain jury instruction. With the exception of cases of limited value which are neither explained nor analyzed, Willaby fails to provide a reasoned basis for these contentions. " 'The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " In re Marriage of Auriemma, 271 Ill. App. 3d 68, 72, 648 N.E.2d 118 (1994), quoting Thrall Car

**15**

No. 1-04-1311

Manufacturing Co. v. Lindquist, 145 Ill. App. 3d 712, 719, 495 N.E.2d 1132 (1986). Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)) requires the appellant to clearly set out the issues raised, supported by relevant authority. Because Willaby has failed to do this, these arguments are waived. Universal Casualty Co. v. Lopez, 376 Ill. App. 3d 459, 465, 876 N.E.2d 273 (2007) (arguments not supported by relevant authority are waived).

Second, Willaby appeals the trial court's denial of her motion for summary judgment against Westlake. However, our supreme court has explained that the denial of a motion for summary judgment is not reviewable on appeal where the motion raises only factual issues, like that filed by Willaby in this case, because "any error is merged into the judgment entered at trial." Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 199 Ill. 2d 325, 355, 770 N.E.2d 177 (2002). Accordingly, we do not consider this issue.

As to the issues properly before us, we first address Willaby's contentions against Dr. Patel and Dr. Bendersky and then her contentions against Westlake.

I. Dr. Patel and Dr. Bendersky

Willaby contends certain comments made by counsel for Dr. Patel in his closing argument denied her a fair trial. She also contends the jury's verdict in favor of Drs. Patel and Bendersky is contrary to the manifest weight of the evidence.

**16**

### A. *Closing Argument*

In concluding his closing argument, counsel for Dr. Patel stated, "The decision facing a doctor who is sued for malpractice is a difficult one.  Should he defend himself in court risking his financial future?"  Counsel for Willaby promptly objected.  The trial court sustained the objection and instructed the jury to disregard the comment.

Willaby contends the reference to Dr. Patel's "financial future" denied her a fair trial and constituted reversible error. Willaby argues Dr. Patel's finances were not at issue in the case and notes Dr. Patel himself filed a motion in limine seeking to bar any reference to the parties' finances.

An improper comment that also violates a motion in limine does not necessarily constitute reversible error.  See Magna Trust Co. v. Illinois Central R.R. Co., 313 Ill. App. 3d 375, 395, 728 N.E.2d 797 (2000) ("Violation of a motion in limine is not per se reversible error").  To constitute reversible error, such a comment must cause substantial prejudice, not cured by the trial court's actions.  "Improper comments generally do not constitute reversible error unless the party has been substantially prejudiced."  Magna Trust Co., 313 Ill. App. 3d at 395.  Where the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice.  Magna Trust

**17**

Co., 313 Ill. App. 3d at 395.

In this case, there is no question that counsel's reference to the doctor's financial future was improper. However, the trial court immediately sustained Willaby's objection and instructed the jury to disregard the offending comment. Willaby puts forth no argument that substantial prejudice remained even after the trial court took this prompt action. Accordingly, we reject Willaby's claim of reversible error based on defense counsel's improper comment.

### B. *The Sufficiency of the Evidence*

Willaby contends the jury's verdict in favor of Dr. Bendersky and Dr. Patel is against the manifest weight of the evidence.

In an appeal from a jury verdict, "a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." Snelson v. Kamm, 204 Ill. 2d 1, 35, 787 N.E.2d 796 (2003). Rather, a jury verdict may be reversed only where it is against the manifest weight of the evidence. Snelson, 204 Ill. 2d at 35. "A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence." York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 179, 854 N.E.2d 635 (2006).

Willaby presented evidence at trial to show Dr. Bendersky

deviated from the standard of care by placing a suture in her bowel and by failing to detect an infection that led to the wound dehiscence and evisceration. Willaby also presented evidence that Dr. Patel failed to diagnose a pending wound dehiscence and evisceration, left a sponge in her abdomen, and negligently removed her healthy appendix. The defendant doctors, however, presented evidence that Dr. Bendersky did not place a stitch through her bowel and that the wound dehiscence and evisceration were not caused by an infection but, rather, occurred because Willaby was obese, because Willaby coughed, or because of unknown reasons. Dr. Patel also presented evidence demonstrating that he acted within the standard of care when he relied on the nurses' representation that there was an accurate sponge count and when he removed an abnormal looking appendix.

Willaby essentially argues on appeal that her theory of liability against Dr. Bendersky and Dr. Patel should have been accepted by the jury. However, where the parties present conflicting evidence, we cannot say the jury's verdict is against the manifest weight of the evidence. York, 222 Ill. 2d at 179.

Because the evidence was conflicting, we do not disturb the jury's verdict in favor of Drs. Patel and Bendersky.

## II. Westlake

Turning to the contentions against Westlake, Willaby argues

**19**

the trial court erred when it struck the entirety of Nurse Cloud's expert testimony and directed a verdict in Westlake's favor.

A plaintiff in a medical negligence case must plead and prove three elements: (1) the proper standard of care against which the defendant healthcare professional's conduct is measured; (2) a deviation of that standard; and (3) an injury proximately caused by that deviation. Purtill v. Hess, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986). Generally, "expert testimony is necessary in professional negligence cases to establish the standard of care and that its breach was the proximate cause of the plaintiff's injury." Snelson v. Kamm, 204 Ill. 2d 1, 43-44, 787 N.E.2d 796 (2003). In this case, Willaby called Nurse Lutricia Cloud as her expert witness.

In Illinois, two foundational requirements and a discretionary requirement of competency must be established before a health care professional may offer expert testimony regarding the standard of care. Sullivan v. Edward Hospital, 209 Ill. 2d 100, 114-15, 806 N.E.2d 645 (2004); Purtill, 111 Ill. 2d at 243; Alm v. Loyola University Medical Center, 373 Ill. App. 3d 1, 5, 866 N.E.2d 1243 (2007). Specifically, a trial court must determine (1) whether the healthcare professional is a licensed member of the school of medicine about which he or she proposes to testify, and (2) whether the healthcare professional is familiar with the methods,

procedures, and treatments ordinarily observed by other healthcare providers in either the defendant's community or a similar community. Sullivan, 209 Ill. 2d at 114-15; Purtill, 111 Ill. 2d at 243. Once these foundational requirements are met, the trial court has discretion to find the healthcare professional qualified and competent to state his or her opinion regarding the standard of care. Sullivan, 209 Ill. 2d at 115; Purtill, 111 Ill. 2d at 243.

Westlake does not argue Nurse Cloud was not qualified or competent to state her opinion. Rather, Westlake's claim is that Nurse Cloud's testimony did not accurately state the applicable standard of care for the Westlake nurses. Based on her failure to properly identify the standard of care, the trial court sustained Westlake's motion to strike Nurse Cloud's testimony and directed a verdict in Westlake's favor "due to the insufficiency of Nurse Cloud's testimony as a matter of law."

The long-standing rule in Illinois is that "a verdict should be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." Heastie v. Roberts, 226 Ill. 2d 515, 544, 877 N.E.2d 1064 (2007), citing Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). A

**21**

directed verdict is reviewed <u>de novo</u>.  <u>Schiff v. Friberg</u>, 331 Ill. App. 3d 643, 657, 771 N.E.2d 517 (2002).

Nurse Cloud testified the Westlake nurses failed to maintain an accurate sponge count, failed to follow nursing and hospital protocol regarding counting sponges, and failed to advise Dr. Patel that they did not have an accurate sponge count.  She defined the standard of care as "the best possible care for patients which prevents or avoids causing them any harm."

It is true that Nurse Cloud did not accurately describe the standard of care applicable in an Illinois professional negligence case.  See, <u>e.g.</u>, <u>Advincula v. United Blood Services</u>, 176 Ill. 2d 1, 23, 678 N.E.2d 1009 (1996) ("In Illinois, the established standard of care for all professionals is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances").  However, Nurse Culver's expert testimony accurately described the standard of care as "what a reasonably qualified registered nurse would do in the same or similar situation."  While Nurse Culver testified on behalf of the defense after the plaintiff rested her case, we are obliged by <u>Pedrick</u>, 37 Ill. 2d at 510, to consider <u>all</u> of the evidence when determining whether a directed verdict is proper at the <u>close</u> of the case.  <u>Cf</u>. <u>Walski v. Tiesenga</u>, 72 Ill. 2d 249, 252, 381 N.E.2d 279 (1978) (directed verdict at <u>close of</u>

plaintiff's case proper where "plaintiff failed to establish the requisite professional standard of care against which the defendant's conduct was to be judged"). The record also contains additional testimony regarding the standard of care provided by Nurses George, Leder, and Fitzgerald, who described in detail Westlake's sponge-counting procedures. Because evidence of the applicable standard of care was before the jury, the trial court erred in directing a verdict based on Nurse Cloud's inaccurate testimony regarding the applicable standard of care.

It also not proper to strike all of Nurse Cloud's testimony simply because she inaccurately stated the standard of care. Other aspects of Nurse Cloud's testimony, including that the nurses failed to maintain an accurate sponge count, deviated from Westlake's sponge-counting procedures, and failed to notify Dr. Patel of the inaccurate count, were properly before the jury.

When we consider all of the evidence in Willaby's favor, we cannot say a verdict for Willaby on the issue of Westlake's negligence could not stand. See Anderson v. Martzke, 131 Ill. App. 2d 61, 65, 266 N.E.2d 137 (1970) (trial court erred in directing a verdict in favor of defendant doctor error where defendant doctor, called as an adverse witness, gave expert testimony sufficient to establish prima facie case).

Even if we were to find the testimony from Nurses Culver,

**23**

George, Leder, and Fitzgerald insufficient to establish the applicable standard of care as a matter of law, we are unconvinced a directed verdict would be warranted.

It has been established that leaving a sponge in a patient's body following surgery is prima facie evidence of medical negligence. Piacentini v. Bonnefil, 69 Ill. App. 2d 433, 447, 217 N.E.2d 507 (1966) ("If a sponge was left in the plaintiff's body she has established a prima facie case of negligence against the doctor and the burden of coming forth with the evidence then shifts to the defendant doctor"). Under similar facts here, Willaby was not obligated to present an expert to establish the standard of care and its breach. An expert witness is not required where the defendant's actions are grossly apparent or where the treatment is so common that a layperson would understand the conduct without the necessity of an expert. See Heastie, 226 Ill. 2d at 554; Sullivan, 209 Ill. 2d at 112; Purtill, 111 Ill. 2d at 242.

Failing to keep an accurate count of sponges so that a sponge is left in a patient's body following surgery is an example of such a case. See Comte v. O'Neil, 125 Ill. App. 2d 450, 454, 261 N.E.2d 21 (1970) (leaving a sponge in the abdomen an example of the "common knowledge" or "gross negligence" exception to expert testimony); Restatement (Second) of Torts, § 328D, Comment d, at 158 (1965) ("there are other kinds of medical malpractice, as where

**24**

a sponge is left in the plaintiff's abdomen after an operation, where no expert is needed to tell the jury that such events do not usually occur in the absence of negligence"). Based on the presence of the sponge in Willaby's abdomen, she established a prima facie case of medical negligence. The burden then shifted to Westlake to explain that the failure of the nurses to keep an accurate count such that a sponge was left in Willaby's abdomen was the result of something other than its negligence. Piacentini, 69 Ill. App. 2d at 447.

For these reasons we cannot say the evidence so overwhelmingly favored Westlake that a directed verdict in its favor was warranted. Accordingly, the trial court erred in directing such a verdict.

Willaby additionally raises the contention that the trial court erred when it refused to allow her to amend her complaint to include a negligence count based on res ipsa loquitur against Westlake. In light of our determination that a remand for a new trial against Westlake is in order, we do not decide this issue. Rather, we leave the issue to the sound discretion of the trial court upon remand.

                          CONCLUSION

For the reasons stated above, we affirm the circuit court's entry of judgment in favor of Dr. Patel and Dr. Bendersky. We

**25**

reverse the circuit court's grant of a directed verdict in favor of Westlake and remand for a new trial as to Westlake only.

Affirmed in part and reversed in part; cause remanded.

WOLFSON and R. GORDON, JJ., concur.

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

**MARY WILLABY,**

    **Plaintiff-Appellant,**

**v.**

**CLARA BENDERSKY, HASMUKH PATEL,**
**and WESTLAKE COMMUNITY HOSPITAL,**
    **Defendants-Appellants.**

### No. 1-04-1311

**Appellate Court of Illinois**
**First District, First Division**

**Filed: June 25, 2008**

**JUSTICE GARCIA delivered the opinion of the court.**

**WOLFSON and R. GORDON, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable John E. Morrissey, Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF -**<br>**APPELLANT** | **Michael C. Goode**<br>**11 S. LaSalle Street, Suite 2802**<br>**Chicago, Illinois 60603** |
| **For DEFENDANT -**<br>**APPELLEE,**<br>**Hasmukh Patel, M.D.** | **Edward M. Kay**<br>**Richard L. Murphy**<br>**Paula M. Carstensen**<br>**Clausen Miller, P.C.**<br>**10 S. LaSalle Street**<br>**Chicago, Illinois 60603** |

**For DEFENDANTS -**    **Mark J. Lura**
**APPELLEES,**    **Diane I. Jennings**
**Clara Bendersky, M.D.**    **Anderson, Rasor & Partners, LLP**
**and Westlake**    **55 E. Monroe Street, Suite 3650**
**Community Hospital**    **Chicago, Illinois 60603**