2015 IL App (1st) 131587
No. 1-13-1587

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| JOANNE GULINO, Individually and as | ) | Appeal from the Circuit Court |
| Independent Administrator of the Estate of | ) | of Cook County. |
| Matthew Gulino, Deceased, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | No. 10 L 14410 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| MARIA ZURAWSKI, R.N., and | ) | James P. Flannery, |
| ACUTE EXTRACORPOREAL | ) | Judge Presiding. |
| SERVICES, L.L.C., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court with opinion.
Presiding Justice Mason and Justice Fitzgerald Smith concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Joanne Gulino (Joanne or plaintiff), individually and as the independent administrator of the estate of her husband Matthew Gulino (Matthew) filed a medical malpractice action against defendants Maria Zurawski, R.N., and her employer, Acute Extracorporeal Services, L.L.C. (AES), in which she alleged that Zurawski was negligent in her treatment of Matthew and that her negligence proximately caused his death. The cause proceeded to trial, where the jury ultimately returned with a verdict finding defendants guilty of

negligence and awarded plaintiff damages in the amount of $12,261,131. On appeal, defendants challenge the verdict arguing: (1) the circuit court erred in denying their motion for a judgment notwithstanding the verdict; (2) the verdict is against the manifest weight of the evidence; and (3) the circuit court made several erroneous rulings concerning the permissible scope of expert witness testimony. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 2                                      BACKGROUND

¶ 3                   Overview of Thrombotic Thrombocytopenic Purpura

¶ 4         Matthew died on October 25, 2009, from complications of Thrombotic Thrombocytopenic Purpura (TTP), a rare blood disease. In a TTP patient, a protein in the patient's plasma cause the platelets in his body to clump together, which then clog his blood vessels. As a result, the patient's red blood cells, the cells responsible for carrying oxygen throughout the body, cannot effectively pass through the blood vessels and his organs become damaged due to lack of oxygen. TTP is universally fatal without prompt diagnosis and treatment. Patients with TTP typically present with nonspecific symptoms such as fatigue, shortness of breath, bruising, and possible neurological symptoms like confusion or headaches. Patients are typically diagnosed following a series of blood tests including a Complete Blood Count (CBC) and blood smear. A CBC measures the number of red blood cells, white blood cells and platelets in a person's body and the results of a CBC performed on a TTP patient will reveal a lower than normal level of platelets and red blood cells. A blood smear, in turn, will reveal abnormally shaped red blood cells. Although TTP can result from an auto-immune disease, in more than 50 percent of TTP patients, the cause of the disease is unknown. The only effective treatment for TTP is plasmapheresis,[1] a treatment that involves the use of a large machine to remove the patient's blood from his body in order to separate the plasma from the rest

---

[1] Plasmapheresis is also sometimes referred to as plasma exchange therapy.

of the blood. The patient's blood is then combined with plasma from a donor and ultimately reintroduced into the patient's body. Each plasmapheresis treatment takes two to three hours to complete and the treatments are done on a daily basis until the TTP patient begins to improve. Absent plasmapheresis treatments, a TTP patient will die.

¶ 5                         Events Preceding Matthew's TTP diagnosis and Death

¶ 6             At the start of 2009, Matthew was a healthy 49-year-old married father of three children. He had his annual checkup in June 2009 with his primary care physician, Doctor Gregory Rausch, and aside from having high cholesterol, Matthew was otherwise healthy. Beginning around October 12, 2009, however, Matthew began experiencing various unusual symptoms including nausea, fatigue, shortness of breath, chills and lightheadedness. When the symptoms did not dissipate over the next few days, he sought treatment from his primary care physician. On October 19, 2009, Doctor Rausch ordered an electrocardiogram (EKG) and a stress test to determine whether Matthew had a potential cardiac issue. He also ordered a partial blood test to check Matthew's cholesterol level since it had been high during his recent annual exam. Based on the results of his tests as well as a physical exam, Doctor Rausch diagnosed Matthew with anxiety and prescribed him Xanax, an anti-anxiety medication. Matthew, however, returned to Doctor Rausch's office two days later on October 21, 2009, because he was not experiencing significant relief from his symptoms. Doctor Rausch did not conduct any additional tests at that time, but suggested that Matthew consider making an appointment to see a psychiatrist. The following day, October 22, 2009, Matthew was still experiencing symptoms and sought emergency treatment at Palos Community Hospital where he was attended to by Doctor Brian Crowley. After hearing Matthew describe his symptoms and learning that his primary care physician had recently diagnosed him with anxiety, Doctor Crowley concluded that Matthew

was suffering from an acute anxiety reaction and prescribed a stronger anti-anxiety medication. Neither Doctor Rausch nor Doctor Crowley ordered a CBC before making their respective diagnoses.

¶ 7        Three days later, on October 25, 2009, Matthew woke up experiencing slurred speech and mobility problems with his left arm. His wife Joanne called 911 and he was taken to Advocate Christ Medical Center (Advocate). Matthew arrived at Advocate at 8:57 a.m. and underwent several tests including a CBC. Blood tests revealed that Matthew's platelet count was low and that there was evidence of damage to his red blood cells. Further testing revealed that Matthew was experiencing liver and kidney failure as well as significant neurological impairment. Matthew was ultimately diagnosed as having TTP by Doctor Hamad, a hematologist, sometime after 4 p.m. that day. Doctor Hamad directed Doctor Murathanun, the second year resident in charge of Advocate's Medical Intensive Care Unit (MICU), to contact defendant AES, the company with which Advocate had a contract to provide plasmapheresis services, to arrange for a plasmapheresis treatment for Matthew. The call to AES was made at approximately 4:30 p.m. and defendant Zurawski was dispatched to provide Matthew's plasmapheresis treatment at 4:42 p.m. Zurawski, however, did not arrive at Advocate to perform the procedure until approximately 11 p.m. By that time, Matthew had gone into cardiac arrest. He was unable to be resuscitated and he was pronounced dead at 11:40 p.m. The cause of death was multiple organ failure.

¶ 8                                        Lawsuit

¶ 9        Following her husband's death, plaintiff filed a complaint and an amendment thereto advancing claims of medical negligence against various medical facilities and personnel including Doctor Rausch, Doctor Crowley, Advocate, AES and Zurawski, alleging that the

defendants' negligent failure to properly and timely diagnose and treat her husband caused his death. In pertinent part, the second amended complaint alleged that AES and Zurawski were negligent "in one of the following ways: (a) They failed to arrive promptly at Advocate Christ to provide plasmapheresis services to [Matthew]; or (b) They failed to maintain or enforce a reasonable quality control system to verify that nurses called to provide emergency services at Advocate Christ actually arrived and performed the services in a timely manner; or (c) They failed to recognize the need to respond emergently to the call from Advocate Christ for [Matthew]; or (d) *** [F]ailed to arrange for and provide plasmapheresis equipment and services to Matthew [] when plasmapheresis had been ordered by a physician attending to his care." Defendants, in turn, filed responses denying plaintiff's allegations of negligence and the cause subsequently proceeded to a jury trial.

¶ 10                                                    Trial

¶ 11        Joanne Gulino testified that her husband had been in good health up until October 2009. She recalled that he began experiencing various symptoms around October 12, 2009, including chills, fatigue and flu-like symptoms. Thereafter, on the morning of October 19, 2009, her husband complained that his heart was racing and that his sternum hurt. At that point, Joanne called Doctor Rausch, and made an appointment for her husband later that day. During Matthew's appointment, he relayed his symptoms to a nurse who told him that his symptoms "sound[ed] like anxiety." Joanne recalled that Doctor Rausch ordered an EKG and a stress test once he heard that Matthew had been experiencing symptoms of nausea, lightheadedness, and shortness of breath. Ultimately, Doctor Rausch diagnosed her husband with anxiety and provided him with a prescription for Xanax. Despite receiving the prescription, Joanne testified that Matthew was still feeling poorly a few days later and had noticed some bruising around his

elbows. He returned to see Doctor Rausch on October 21, 2009, and was examined for other areas of bruising, but none were found. At the conclusion of that appointment, Doctor Rausch provided her husband with a referral for a psychiatrist.

¶ 12 The following day at approximately 1 p.m., Joanne testified that she received a phone call from her husband, in which he complained that he felt like he "was going to have a heart attack." When she called Doctor Rausch's office, a nurse advised her to take her husband to the emergency room. In accordance with those instructions, Joanne took her husband to Palos Community Hospital where they met with Doctor Crowley and informed him of the symptoms Matthew had been experiencing. Doctor Crowley did not order any blood work, but he did provide Matthew with an injection of Ativan, another anti-anxiety medication, which seemed to help. Matthew then discontinued the Xanax and continued taking Ativan.

¶ 13 Three days later, however, on October 25, 2009, Matthew woke up with slurred speech and his left arm and left side of his face appeared to be paralyzed. Joanne immediately called 911 and her husband was taken to Advocate. He remained in the E.R. for several hours before he was ultimately diagnosed with TTP by Doctor Hamad. Joanne was subsequently told that her husband would be transferred to the Advocate's MICU where "they were going to do this procedure called plasmapheresis." She was not told that someone from outside of the hospital would be coming to administer the procedure. Moreover, Joanne was not allowed to be with her husband in the MICU because it was a sterile environment. As a result, Joanne did not know her husband's condition had deteriorated until she heard "code blue" announced on the hospital's intercom. She was subsequently informed sometime thereafter that her husband had died.

¶ 14 Doctor Gregory Rausch confirmed that he was Matthew's primary care physician and that he conducted his annual physical exam on June 15, 2009. During that exam, Doctor Rausch

performed a CBC, which revealed that Matthew had high cholesterol. Matthew was otherwise healthy as his creatine, bilirubin, platelets and hemoglobin levels were all within the normal range. Doctor Rausch testified that he next saw Matthew on October 19, 2009. At that time, Matthew indicated that he had experienced an anxiety attack the previous night and complained of shortness of breath and lightheadedness. Matthew also relayed that he was experiencing job-related stress and stomach problems. Because Matthew had reported being lightheaded and short of breath, Doctor Rausch ordered an EKG and a stress test to determine whether Matthew had a cardiac issue. The results of Matthew's EKG and stress test were relatively normal. He also ordered a basic blood draw, but testified that the test was unrelated to any of the symptoms of which Matthew complained; rather, it was a follow-up test to check Matthew's cholesterol levels. Unlike a CBC, a basic blood draw does not examine a patient's hemoglobin or platelet levels. He explained that he did not order a CBC at that time since he had just ordered one back in June, the results of which were normal. The blood draw revealed that Matthew's cholesterol level remained high and that his creatine and bilirubin levels were also "mild[ly]" elevated.

¶ 15         After considering Matthew's history and the results of Matthew's tests, Doctor Rausch diagnosed Matthew with an anxiety panic disorder and provided him with a prescription for Xanax, an anti-anxiety medication. He confirmed that Matthew returned to his office two days later on October 21, 2009, because he did not feel he was getting significant relief from the Xanax. He further confirmed that he did not order any additional testing at that time, and instead suggested that Matthew consult with a psychiatrist. In addition, Doctor Rausch informed Matthew that he could take more than the prescribed dose of Xanax if he "felt he needed to." The following day, Doctor Rausch recalled that he spoke to Matthew's wife who told him that Matthew had gone to the emergency room complaining of shortness of breath and

lightheadedness and that he received a shot of Ativan and was doing "much better." Because Matthew responded well to the Ativan, Doctor Rausch agreed to change Matthew's prescription from Xanax to Ativan.

¶ 16      On cross-examination, Doctor Rausch acknowledged that he had never diagnosed or treated a patient with TTP. He further acknowledged that many conditions can cause symptoms of shortness of breath and lightheadedness, but explained that he did not order a CBC in October 2009, because he "had no reason to suspect a blood disorder as the cause of his symptoms at that point."

¶ 17      Doctor Brian Crowley confirmed that he met Matthew briefly in the emergency room at Palos Community Hospital on October 22, 2009, after he had been assessed by one of the E.R.'s triage nurses and had undergone an EKG. At that time, Matthew explained that he had recently been seen by his primary care physician, and had been diagnosed with anxiety. He further explained that he felt like he was having a heart attack and was afraid of dying. Matthew, however, did not reveal that he had been experiencing shortness of breath or abnormal bruising and Doctor Crowley did not recall observing bruising on Matthew's body. After meeting with Matthew, Doctor Crowley concluded that he had suffered an "acute anxiety reaction," or panic attack, and treated him with a shot of Ativan, an anti-anxiety medication.

¶ 18      Although he acknowledged that he considered Doctor Rausch's diagnosis prior to making his own diagnosis, Doctor Crowley testified that he conducted his own independent assessment of Matthew and his symptoms. Nonetheless, Doctor Crowley admitted that he assumed that Doctor Rausch had ruled out a physical illness as the cause of Matthew's anxiety and that he did not communicate with Doctor Rausch directly about Matthew or his symptoms. More specifically, Doctor Crowley testified that he assumed that Doctor Rausch had run a CBC;

however, he confirmed that he did not ask Matthew if one had been ordered while he was under Doctor Rausch's care. Doctor Crowley further confirmed that he did not order a CBC or any other testing prior to diagnosing Matthew with an acute anxiety reaction because there was no reason to think that Matthew had a blood disorder. He explained that the diagnosis was based in "large part" on Matthew's medical history as well as on the physical examination he conducted of Matthew in the emergency room. In his professional opinion, the symptoms Matthew described during his emergency room visit were "absolutely not" caused by, or associated with, TTP. Doctor Crowley acknowledged, however, that anxiety is a diagnosis of exclusion. That is, because a patient's symptoms of anxiety can be caused by a physical illness or a mental illness, a physical cause for a patient's anxiety symptoms should be ruled out before an anxiety diagnosis is made. In this case, Doctor Crowley testified that he was able to rule out a physical cause for Matthew's symptoms without ordering a CBC or any other testing.

¶ 19    Doctor Rachamon Murathanun testified that in 2009, he was completing his internal residency program at Advocate and became involved in Matthew's care after he arrived in Advocate's emergency room on October 25, 2009. He recalled receiving a phone call from Doctor Hamad, a hematologist at the hospital, sometime between 4 p.m. and 5 p.m. informing him that a TTP patient was in the emergency room and "the plan was to admit the patient in the [M]ICU and get plasmapheresis done." At Doctor Hamad's instruction, Doctor Murathanun testified that he placed a call to the plasmapheresis company to arrange for Matthew's treatment "as soon as possible." He advised the company's representative that fresh frozen plasma (FFP) had been ordered and that Matthew's catheter was about to be inserted. Doctor Murathanun recalled that during the conversation, he was asked certain questions that he did not know the answers to and that he handed the phone to Doctor Hamad. At the conclusion of the call, Doctor

Hamad told him that "the plasmapheresis people were on their way." Thereafter, Doctor Hamad provided him with additional instructions pertaining to Matthew's treatment while he awaited plasmapheresis. Specifically, Matthew was to be provided with three units of FFP, transfused over a one-hour period, followed by two units of packed red blood cells. Doctor Murathanun testified that he transcribed the Doctor Hamad's order, which he understood to be a "STAT" order, at 5:05 p.m. and immediately gave it to the nursing staff with the expectation that they would follow through with the order. After doing so, Doctor Murathanun returned to the MICU to perform his other duties while he awaited Matthew's transfer.

¶ 20    The next time Doctor Murathanun saw Matthew was at approximately 8 p.m. when he was transferred to the MICU. He was unaware that the ER nursing staff had not administered all three units of FFP that had been ordered for Matthew by Doctor Hamad; rather, he had only been provided with one unit. By the time Matthew had been transferred to the MICU, Doctor Murathanun noticed that Matthew's condition had "definitely" deteriorated. His blood pressure had dropped and he was "unstable." In addition, he was intubated, hooked up to a ventilator, and acidotic. Given Matthew's condition, Doctor Murathanun testified that he attempted to stabilize Matthew's blood pressure and other body systems. Based on his understanding of TTP and plasmapheresis, Doctor Murathanun believed that a patient had to be medically stable in order to receive the treatment. He confirmed that Matthew went into cardiac arrest at 10:40 p.m. and died thereafter. He further confirmed that Matthew did not receive plasmapheresis prior to his death.

¶ 21    Lucita Rodriguez, a registered critical care nurse employed by Advocate, testified that she was involved in Matthew's care when he arrived in the emergency room on October 25, 2009. She confirmed that sometime shortly after 4 p.m., when Matthew was diagnosed with

TTP, he was reassigned to the hospital's MICU unit. Based on hospital records, Matthew's MICU bed became available at 5 p.m.; however, he was not actually transferred from the ER to MICU until sometime after 7:30 p.m. Rodriguez further testified that an order for 3 units of FFP was also entered into the hospital's records sometime after 4 p.m., but acknowledged that the order was not fulfilled and that Matthew only received one unit of FFP at 5:30 p.m. even though it was a "STAT" order. Rodriguez recalled that she accompanied Matthew when he was transferred to the MICU and informed his MICU nurse that Matthew had an outstanding order for two additional units of FFP; however, she conceded that she did not provide a written report to the nurse about the unfulfilled order despite hospital policy requiring both a written and verbal report regarding the treatment of critical care patients.

¶ 22 Michelle Devon George, another critical care nurse involved in Matthew's care, testified that she became Matthew's primary nurse when he was transferred to the hospital's MICU on October 25, 2009, at approximately 7:45 p.m. At that time, Matthew had a catheter in his femoral groin and was on a ventilator. When she tested his vitals, Matthew's temperature, pulse and respiration were abnormal. George was aware that an order for plasmapheresis had been placed, but she did not recall speaking to defendant Zurawski or any other AES employee that evening. Moreover, she did not make any notation in Matthew's records about having any such conversation. If she had been contacted by Zurawski, George testified that she would have informed her that Matthew had a catheter in place for plasmapheresis and "would have told [her] to come." Nurse George also testified that she was unaware that Matthew had not received all three units of FFP that had been ordered before he was transferred to the MICU. Had she been aware that the order was unfulfilled, she would have fulfilled the order herself.

¶ 23    James Walsh, chief technologist in Advocate's blood bank, confirmed that the blood bank received several orders pertaining to Matthew's treatment on October 25, 2009. One order was for three units of FFP and Walsh testified that the three units were fully thawed by 5:15 p.m.; however, only one was actually administered. He did not know why the other two units were not administered. Walsh further testified that he was not aware of any communications between the blood bank and Zurawski that day and stated that it was not the blood bank's policy or practice to initiate phone calls to plasmapheresis nurses. He confirmed that all blood orders are filled out by personnel from the hospital, not by personnel outside of the hospital.

¶ 24    Mimoza Nikolla testified that in 2009, she was employed by Fresenius Medical Care, parent company of AES, and worked as a plasmapheresis coordinator. In that capacity, Nikolla would receive calls from various hospitals who were seeking specialized treatments including plasmapheresis. In response to these calls, Nikolla would dispatch AES employees to various hospitals to perform those procedures. She recalled that at approximately 4:31 p.m. on October 25, 2009, she was advised of Matthew's name, was told he had been admitted to Advocate and was in need of plasmapheresis. Shortly thereafter at 4:39 p.m., Nikolla contacted Lloyd, one of the nurses on call that day, asked if he was available to provide Matthew's plasmapheresis treatment, but was told that he was unable to do so. Accordingly, at 4:42 p.m., Nikolla contacted Zurawski, another on-call nurse, who indicated that she had just finished up a procedure at Central Du Page Hospital and was available to travel to Advocate to provide Matthew's plasmapheresis treatment. Nikolla testified that she advised Zurawski that she needed to go to Advocate "right away." Although she recalled that she spoke to Zurawski several more times throughout the evening, Nikolla could not remember the substance of any of those conversations. When asked about her earlier deposition testimony, Nikolla acknowledged that she had testified

that AES's on-call nurses were supposed to respond "as soon as possible" to a plasmapheresis request. She further acknowledged testifying that there are instances in which plasmapheresis must be administered "quickly" and that the nurses "know the procedure" and "know the duty they have on the days they are on call."

¶ 25　　Nikolla testified that following Matthew's death, she subsequently learned that Zurawski had not traveled directly to Advocate to administer Matthew's plasmapheresis treatment; rather, she had gone to Good Samaritan Hospital to perform a phlebotomy. Nikolla further testified that the phlebotomy was a routine procedure that could have been delayed and that she did not know why Zurawski had gone there to perform the procedure because Zurawski had been informed that Matthew's plasmapheresis treatment was an emergency. Nikolla further testified that if she had known Zurawski had intended to stop at another hospital to perform a phlebotomy procedure, she would have contacted another on-call nurse to administer Matthew's plasmapheresis treatment. Nikolla acknowledged, however, that before Zurawski or any other nurse could administer a plasmapheresis treatment, the hospital would have to prepare the patient for that treatment. Specifically, the hospital would have to insert a catheter and central line into the patient and obtain and thaw fresh frozen plasma. She estimated that these preparations generally take about 2 hours regardless of whether the procedure is deemed "an emergency." Therefore, Nikolla testified that a nurse responding to a request for a plasmapheresis procedure would only need to respond immediately if all of the preparations have been completed and the patient is actually "ready" for the treatment to begin. Although Nikolla spoke to Zurawski several times that evening, she did not specifically recall discussing whether Matthew's catheter had been inserted or whether the FFP needed for his procedure had been ordered.

¶ 26    Defendant Maria Zurawski confirmed on October 25, 2009, she was an "on-call" nurse assigned to work for AES and that she had been performing plasmapheresis for several years. She further confirmed that she received a phone call from Nikolla informing her that Matthew needed emergent plasmapheresis at approximately 4:30 p.m. that day. At the time she received the phone call, Zurawski testified that she was at Central Du Page Hospital finishing up another procedure on a patient and that she informed Nikolla that she was available to provide Matthew's treatment. Instead of going directly to Advocate, however, Zurawski testified that she first went to Good Samaritan Hospital where she performed a phlebotomy procedure from 5:30 p.m. to 7 p.m. After that, she returned to her home in Willowbrook, Illinois. She did not arrive at Advocate until almost 11 p.m.

¶ 27    When asked about the delay, Zurawski acknowledged that a plasmapheresis treatment for a newly diagnosed TTP patient constitutes an emergency, but testified that certain requirements need to be met before the treatment can be provided. She explained that when there is an emergent need for a plasmapheresis treatment, "we have to provide the treatment as soon as the patient has [a] catheter, the FFP is thawed, it's prepared, and the patient is stable." Given that preparations for any plasmapheresis took time, Zurawski testified that it was common practice for her and other on-call nurses to wait to go to the hospital until they received word that plasma had been thawed and a plasmapheresis catheter had been placed. She explained: "Because it was dozens of times we were told that surgeon is on the way to insert the catheter, and we were there and surgeon was called for some other procedure and we were wasting time waiting for catheter, for fresh frozen plasma to be ready. So we develop[ed] this practice to be pretty fast, but accurate, and [we] don't wait at the hospital." Zurawski clarified that this policy was not an

official AES company policy and that the company's official policy regarding the administration of emergency treatment was that care should be provided without delay.

¶ 28    In this case, Zurawski testified that after being dispatched to perform Matthew's plasmapheresis treatment, she placed several calls to Advocate throughout the day to determine whether the prerequisites for his treatment had been satisfied. Specifically, she placed a phone call around 6 p.m. to Advocate's MICU and asked a nurse, whom she assumed was Matthew's nurse, about Matthew's catheter and was told that it was not in place. She also called Advocate's blood bank to check the status of the FFP needed for the procedure. She made additional calls from her home phone to the MICU and blood bank around 8:20 p.m. Zurawski testified that she did not leave her house to go to Advocate after making those calls "because either [the] FFP wasn't ready and the patient did not have [a] catheter." She further testified that "finally by 10:00 o'clock [she] was worried that something was wrong" and placed another phone call to the blood bank and to Matthew's nurse. When she was unable to reach his nurse, Zurawski "didn't wait for an answer [and] went to the hospital." She recalled arriving at the hospital at 11 p.m. Before she finished her preparations, however, Matthew died.

¶ 29    After subsequently reviewing Matthew's hospital records, Zurawski acknowledged that Matthew's plasmapheresis catheter had been inserted shortly before 5 p.m. She testified that if she had been aware that Matthew's catheter was in place when she received the assignment, she would have traveled directly to Advocate instead of driving to Good Samaritan Hospital where she performed the routine phlebotomy. Zurawski also acknowledged that Matthew's medical records indicated that he was not transferred to the MICU until after 7:30 p.m. and thus, she could not have talked to his primary care MICU nurse during the 6 p.m. phone call.

¶ 30      In addition to hearing testimony from medical professionals who were actually involved in Matthew's care, the jury also heard testimony from a number of expert witnesses.

¶ 31                                    Plaintiff's Medical Experts

¶ 32      Doctor Mark Crowther, a practicing hematologist and professor of hematology, testified that in "more than 50 percent of cases" in which people develop TTP, the cause remains unknown. He described the typical presentation and diagnosis of a TTP patient as follows:

> "[The patient] will present with nonspecific symptoms to their family physician or to their primary care provider or to an emergency department with symptoms like fatigue or shortness of breath or neurologic symptoms like headache or changes in their neurologic status. And during the course of investigations for those changes such as the new shortness of breath, they'll have a complete blood cell count done. And the complete blood cell count, when we look back at the number of platelets, we'll find that the number of platelets is lower than it should be. And when we look at the characteristics of red blood cells, we'll find that there's evidence that the red blood cells are being damaged as a result of the disease and that the combination of the typical presentation of fatigue, shortness of breath and maybe some new neurologic findings plus the abnormalities on the complete blood cell count establish the diagnosis of TTP."

¶ 33      Based on his review of Matthew's records, Doctor Crowther opined that the complaints that Matthew voiced to Doctors Rausch and Crowley the week prior to his death were likely caused by TTP. He explained that Matthew's "presentation was very typical for what's reported in the literature of what we would call soft neurologic findings, anxiety, and, secondarily, the shortness of breath or exertional limitation that he described." His opinion that Matthew was experiencing symptoms consistent with TTP when he sought treatment from Doctors Rausch and

Crowley was also bolstered by the fact that there was some evidence that Matthew had begun to experience bruising. He explained: "if your platelet count is low, you will suffer bruising, so many people who present with diseases with a very low platelet count will have apparent bruising."

¶ 34    Because TTP "is a disorder of the plasma," Doctor Crowther testified that it is usually treated in several ways. A doctor can "supplement the patient's plasma by administering someone else's plasma in the form of a transfusion, *** or [by] remov[ing] some of the patient's plasma and replac[ing] it with plasma from a healthy blood donor." In addition to transfusions, TTP patients also undergo plasmapheresis, which is the "definitive therapy for this disease." He described plasmapheresis as "a procedure within which you take a sample of the patient's blood out. You remove the plasma from it. In the case of TTP you replace it with plasma from a healthy blood donor and you give it back to the patient." He testified that plasmapheresis is essential and that "without effective plasmapheresis, patients with TTP uniformly die from this disease. The mortality rate, the rate of death exceeds 90 percent. And with plasmapheresis in large studies that have been done survival is routinely now over 90 percent, so nine out of ten patients will survive if they receive plasmapheresis for this disorder."

¶ 35    After reviewing Matthew's records, Doctor Crowther agreed that Doctor Hamad's order for three units of FFP and two units of packed red blood cells was an appropriate means of providing initial treatment to Matthew following his diagnosis, explaining that "the recommendations and the studies that have been performed would suggest that the patient should receive a continuous infusion of plasma until the plasmapheresis became available." It is apparent from Advocate's records, however, that Matthew only received one unit of the FFP that had been ordered by Doctor Hamad. Doctor Crowther opined that the single unit of FFP that he

received, standing alone, meant that Matthew's TTP was "essentially untreated." He further testified that the failure to timely administer the plasmapheresis treatment also contributed to Matthew's death. He opined that had the treatment been administered in a timely manner, Matthew would have likely survived. Specifically, he testified that had the plasmapheresis treatment been administered as late as 9 p.m., Matthew would likely have lived. Therefore, he concluded that Zurawski's failure to arrive at the hospital in a timely manner to administer the treatment proximately caused Matthew's death. Doctor Crowther reiterated that the plasmapheresis treatment could not have been performed in Zurawski's absence and that the only "therapy that could have saved his life was the prompt institution of plasmapheresis and that was not delivered."

¶ 36        Although Doctor Crowther acknowledged that Matthew was experiencing complications caused by acute TTP when he arrived at Advocate, he testified that "it is common for patients with severe manifestations of TTP to recover completely" if they receive appropriate treatment. He also acknowledged that Advocate's charts revealed that Matthew's blood pressure was "somewhat variable" and that he had "evidence of damage to a number of different organ systems" as early as 4 p.m. on October 25, 2009, but testified that plasmapheresis should have nonetheless proceeded because without that treatment any TTP patient would die. He emphasized that TTP is a "uniformly" fatal disease absent proper treatment. Although he testified that he believed that Matthew would have survived had he received a timely plasmapheresis treatment, Doctor Crowther acknowledged that "there are people who die of TTP despite being given maximum therapy." He conceded that a single plasmapheresis treatment would not have cured Matthew and testified that Matthew would have needed to undergo a series

of treatments. However, he quantified Matthew's chances for survival "as greater than 50 percent" had he received a timely initial plasmapheresis treatment.

¶ 37 Doctor Jordan Grumet, a physician board-certified in internal medicine, confirmed that he reviewed Matthew's medical records as well as the deposition testimony of the medical professionals who provided medical care to Matthew prior to his death. Doctor Grumet testified when a patient comes to a doctor with various symptoms, the standard of care requires the physician to undertake a diagnostic process to identify the patient's diagnosis. Doctors typically conduct various tests to facilitate that process including CBCs, Complete Metabolic Panels (CMP) and EKGs. Based on the results of those tests, Doctor Grumet explained that the doctor will then begin to develop a list of differential diagnoses, *i.e.*, "those things that we think could be happening with the patient."

¶ 38 Having reviewed the records completed by Doctor Rausch when he assessed Matthew on October 19, 2009, and October 21, 2009, and diagnosed him with anxiety, Doctor Grumet opined that he did not comply with the requisite standard of care. Namely, Doctor Grumet faulted Doctor Rausch for failing to conduct a CBC test given the shortness of breath and dizziness that Matthew had been experiencing. He explained:

"When we talk about the differential process, the patient came in with anxiety-type symptoms as well as a number of other symptoms. The differential process would say that before you say this is a primary anxiety disorder, you consider the other symptoms, shortness of breath, dizziness, and then eventually the abnormal blood tests. So these kinds of symptoms have a broad differential diagnosis. In other words, lots of different things can cause these problems. So in order to narrow down the potential life-

threatening causes as well as the other causes so that we can treat the patient appropriately, [a] CBC would be one of a number of tests that should have been done."

¶ 39    Doctor Grumet specifically noted that dizziness, in particular, could be caused by a number of different ailments in addition to anxiety, including heart, lung, or blood abnormalities and testified that a CBC would have been required to rule out blood disorders like anemia and TTP.  Accordingly, Doctor Grumet concluded that the standard of care required Doctor Rausch to consider and rule out a blood disorder before diagnosing Matthew with anxiety and prescribing an anti-anxiety drug.  Instead of doing so, Doctor Rausch instead "focused on anxiety and did one test to rule out other diseases with a stress test *** [and] neglected to think about blood disorders and other disorders."  Had a CBC been performed, Doctor Grumet believed that the results of that test would have revealed that Matthew's hemoglobin and platelets were low given that there was some evidence in his medical records that Matthew had begun experiencing some bruising.

¶ 40    Although Doctor Grumet acknowledged that Matthew had told Doctor Rausch that he believed he was experiencing anxiety during his October 2009 visits, Doctor Grumet indicated that those statements did not diminish Doctor Rausch's duty to determine whether there was another cause for the patient's symptoms.  He explained: "The patient is an important part of the diagnosis, but they're not everything.  So [doctors] need to go past what the patient says and delve further and find out."

¶ 41    On cross-examination, Doctor Grumet acknowledged that he has never diagnosed a patient with TTP and that he encountered only two instances of TTP during his training as a medical resident.  He also acknowledged that patients with anxiety can experience many of the

same symptoms experienced by Matthew including shortness of breath, dizziness, chest pain, nausea, and fatigue.

¶ 42    Doctor Kenneth Corre, a specialist in emergency medicine, testified that the applicable standard of care requires emergency care doctors to engage in a "differential diagnosis process" to evaluate and diagnose patients. After reviewing relevant medical records, Doctor Corre opined that the emergency room assessment performed by Doctor Crowley when Matthew sought treatment at Palos Community Hospital "fell short of the standard of care." Specifically, he testified that Doctor Crowley "did not perform a more *** detailed assessment of the signs and symptoms that [Matthew] presented with and he as a result [could not] support the diagnosis of an acute anxiety reaction, which he came up with, based on what he asked and what he documented, nor did he explain away the significant chest pain that [Matthew] was having at the time of his visitation." He specifically faulted Doctor Crowley for failing to order additional testing to rule out a physical medical condition as the cause of Matthew's symptoms. He specified that one of the tests that Doctor Crowley should have ordered was a CBC. In Doctor Corre's opinion, it is "more probable than not" that symptoms that Matthew complained of during his visit to Palos Community Hospital were the result of TTP, a physical medical condition, rather than anxiety or an acute anxiety reaction and that TTP should have been included in the differential diagnosis list. Doctor Corre further testified that Doctor Crowley also deviated from the standard of care by not contacting Doctor Rausch to inquire whether any blood tests had been done and what their findings were because that was "critical information." Notwithstanding Matthew's recent examination by his primary care physician, Doctor Corre testified Doctor Crowley had an "independent responsibility" to fully examine and diagnose Matthew rather than simply rely on the diagnosis of the patient's primary care physician.

¶ 43        Deborah MacVean, a registered nurse with certifications in oncology and intravenous therapy, was retained by plaintiff to evaluate the nursing care Matthew received prior to his death.  After reviewing pertinent medical records and deposition testimony, MacVean opined that the conduct of Advocate's nursing staff as well as that of Zurawski fell below the requisite standard of care.  With respect to the nurses at Advocate, MacVean found it significant that the medical staff failed to fully comply with the doctor's orders.  Specifically, in accordance with Doctor Hamad's order, Matthew was to have been given three units of FFP followed by two units of fresh packed red blood cells; however, the records showed that Matthew only received one unit of FFP.  Although MacVean conceded that circumstances sometimes arise that make it impossible for a nurse to comply with a doctor's orders, she testified that the standard of care requires the nurse to communicate those circumstances to the doctor and "get further direction." In Matthew's case, Advocate's nursing staff never conveyed such difficulties to the doctor.

¶ 44        Regarding Zurawski, MacVean testified that she breached the standard of care by failing to report "without delay" to Advocate after being informed of Matthew's emergent status and need for plasmapheresis.  More specifically, she testified that Zurawski's decision to travel first to Good Samaritan Hospital to perform a routine phlebotomy and then to her residence where she stayed for several hours instead of reporting directly to Advocate was a deviation from reasonable nursing standards.  Rather, the requisite standard of nursing care required Nurse Zurawski to travel directly to Advocate from Central Du Page Hospital, a trip that would have taken approximately 45 minutes.  Had she done so, MacVean estimated that Zurawski would have arrived at Advocate at approximately 5:45 p.m., and could have commenced plasmapheresis by 6:45 p.m. once she set up her machine.  MacVean further testified that  any uncertainty that Zurawski may have had as to whether a catheter was in place for Matthew's

plasmapheresis treatment would not have excused her failure to report directly to Advocate after receiving the call.

¶ 45       On cross-examination, MacVean acknowledged that she had no personal experience treating TTP patients and has never seen a plasmapheresis treatment being administered to a patient.   Moreover, she had not received any specialized training regarding the use of a plasmapheresis machine.   Based on her review of Matthew's medical records, MacVean acknowledged that he was not doing well when he was transferred from Advocate's emergency room to the MICU.   MacVean also acknowledged that she testified in an earlier deposition that the term "urgent" might have a different meaning as applied to emergency room nurses versus plasmapheresis nurses.

¶ 46                                    Defense Expert Witnesses

¶ 47       Doctor Joseph Hennessy, a board-certified internal medicine physician, testified on behalf of Doctor Rausch.   He testified that TTP is an "extremely rare" disease and that he encountered a TTP patient "maybe once or twice" during his residency.   After reviewing Matthew's medical records, Doctor Hennessy opined that Doctor Rausch complied with the requisite standard of care when he examined and treated Matthew in October 2009.   Given Matthew's complaint of shortness of breath and light headedness as well as his history of high cholesterol, he testified that Doctor Rausch was correct to consider whether there was a cardiac cause for those symptoms and that his decision to order an EKG and a stress test complied with the standard of care.  Moreover, based on Matthew's history and the results of his physical exam, Doctor Hennessy testified that the standard of care did not require Doctor Rausch to order a CBC at that time.  He explained: "[Matthew] wasn't complaining of bleeding.  His examination was fine.  His vital signs were fine.  He was not pale.  He was pink on examination, so I don't—I

don't think he needed to order the CBC." Doctor Hennessy further testified that even though results of Matthew's CMP indicated that his creatine and bilirubin levels were elevated, these elevations would not cause a reasonably careful physician to suspect that Matthew had an urgent medical condition. He explained that fluctuations of those levels are not uncommon and that the standard of care would have simply required Doctor Rausch to repeat the blood test in one to two months.

¶ 48        On cross-examination, Doctor Hennessy acknowledged that the symptoms of shortness of breath and lightheadedness of which Matthew complaint could also be attributed to a blood disorder, like anemia. Although Doctor Rausch ruled out a cardiac cause for those symptoms, Doctor Hennessy conceded that he did not rule out a blood disorder as a cause for those symptoms. He further conceded that anxiety does not cause any change in a patient's creatine and bilirubin levels.

¶ 49        Doctor John Ortineau, a board-certified emergency care physician, testified as Doctor Crowley's expert witness. Having reviewed Matthew's medical records, he opined that Doctor Crowley "fully complied with the standard of care for an emergency physician" and that there was "nothing that Dr. Crowley did or did not do that caused Mr. Gulino to die." Although he never treated a patient with TTP, Doctor Ortineau indicated that he was familiar with the presentation of the blood disorder. He further indicated that "there was nothing about Mr. Gulino's symptoms, nothing about his examination findings, nothing about anything in his history that would lead a physician to believe or even consider that he was suffering from TTP or any other type of blood disorder." Moreover, Doctor Ortineau opined that an acute anxiety diagnosis was "a very reasonable diagnosis and one that fit[] the signs and symptoms and everything about the [emergency room] encounter." He acknowledged, however, that looking at

all the evidence "in hindsight," Matthew "likely had only one condition, one illness, and that was TTP."

¶ 50        Doctor Phillip Hoffman testified on behalf of Advocate. Board certified in internal medicine, oncology and hematology, Doctor Hoffman testified that TTP has a high mortality rate unless it is diagnosed and treated quickly and that the outcome of a TTP patient depends upon how sick he is at the time of his diagnosis and treatment. He explained: "basically the sicker you are, the harder it is to turn it around, and the more likely you are to die from the condition." He testified that the records in Matthew's case revealed that he was already experiencing multi-system organ failure by the time that Doctor Hamad diagnosed him as having TTP. Based on the severity of Matthew's condition at the time he was diagnosed, Doctor Hoffman opined that neither FFP nor plasmapheresis would have been able to save him and that he would have died whether or not he received the treatment. He agreed however, that most TTP patients who receive prompt and appropriate plasmapheresis treatment survive.

¶ 51        Doctor Scott Neely testified on behalf of AES and Zurawski. He is board-certified in many disciplines including internal medicine, pulmonary medicine, critical care, hospice and palliative care. During the years that he has been practicing, Doctor Neely estimated that he encounters one TTP case per year and has seen many cases in which a TTP patient suffers from multi-system organ failure caused by their illness. Having reviewed Matthew's medical records, Doctor Neely testified that it was clear that Matthew was suffering from severe organ failure caused by TTP when he arrived at Advocate on October 25, 2009. He noted that lab results taken at 12:20 p.m. indicated a high level of creatine, which is a "sign[] of kidney failure." The creatine level continued to rise throughout the day, going from 1.62 at 12:20 p.m. to 2.8 at 5:17 p.m. He explained that creatine "doesn't go up that fast under normal circumstances" and that

this drastic sudden increase indicated that Matthew was experiencing "almost complete shutdown of [his] kidneys" as well as "probably a lot of tissue damage." Moreover, Matthew's blood pressure readings were also "very low" and Doctor Neely opined that he was in shock by the time he was transferred to Advocate's MICU at 7:43 p.m. Given Matthew's precarious state, Doctor Neely ultimately concluded that even if he had undergone plasmapheresis by 6:45 p.m. on October 25, 2009, it "would [not] have been beneficial to him at that time." He explained:

"I think the most important reason for saying that is that by 6:00 or 7:00 o'clock at night, he had already developed an extraordinary amount of tissue damage. What appears to have happened, looking at his clinical course and looking at the events that occurred over the entire evening as well as looking at the lab tests, is that he sustained very severe multiple organ damage over the course of that day. *** If somebody has acute renal failure that causes the creatine to go from 1.6 to 2.8 something over a period of five hours, by 5:00 o'clock or 4:30 in the afternoon when you measure that with a chemistry test, the damage is already done. If somebody has tissue damage probably in multiple organs, probably the muscles, the gut, the brain, the liver, the kidneys, if somebody had such severe tissue damage that their lactic acid goes to over seven at 5:00 o'clock at night, the damage is already done. So going back and attempting to undo the original insult, you would try to do it. I mean any reasonable intensive care specialist I think or hematologist would still try to treat the underlying problem, but what you can see in this case is that a very accelerated phase of essentially actively dying has started to occur already. The slope is extremely steep. The damage to all of his organs have essentially already—has essentially already occurred. So going back and doing plasmapheresis might begin to treat the underlying problem, the TTP, but it's going to do

absolutely nothing for all the organ damage that's already occurred. And that's what he died of."

¶ 52    Doctor Neely further testified that even if the plasmapheresis equipment had been ready by 6:45 p.m., the treatment could not have been safely administered to Matthew at that time give his unstable blood pressure. In his medical opinion, Matthew could not have tolerated the treatment and attempting to administer plasmapheresis at that time "would have accelerated his instability." On cross-examination, however, Doctor Neely acknowledged that most TTP patients survive if they are given prompt and appropriate treatment and that plasmapheresis allows "more than 80 percent of people with TTP [to] survive."

¶ 53    Doctor Gerald Soff also testified on behalf of AES and Zurawski. Board certified in hematology and internal medicine, Doctor Soff acknowledged that TTP is a "relatively rare disease," but stated that it was one that he encountered "on a somewhat regular basis" during his practice as a hematologist. Specifically, he estimated that he has treated between 50 to 70 TTP patients during his career and has overseen numerous plasmapheresis treatments. Although he agreed that plasmapheresis treatments should be administered to TTP patients "in a prompt fashion," he stated that there was "no fixed number" as to when the treatment must be given. Based on his review of pertinent medical records, Doctor Soff opined that "no action or inaction by Nurse Zurawski or AES contributed to the death of [Matthew]." Although Doctor Soff was prepared to testify that Matthew would have died had plasmapheresis began as early as 6:45 p.m., the circuit court precluded him from doing so because it was "cumulative testimony" given that Doctor Neely had offered the same opinion. The circuit court also precluded Doctor Soff from testifying that a reasonable hematologist would defer to a MICU physician's decision to

stabilize a patient's blood pressure before allowing plasmapheresis to proceed, reasoning that such testimony was not relevant.

¶ 54      Kelly Dyar, a registered dialysis nurse and plasmapheresis specialist, was called to provide expert testimony pertaining to the standard of nursing care applicable to Zurawski. After her review of relevant medical records and deposition testimony, Dyar opined that Zurawski complied with the requisite standard of care. In doing so, Dyar acknowledged that "plasmapheresis is the mainstay of therapy for TTP" and that it should be administered "as soon as possible," but explained that it is not a procedure that can begin immediately; rather, a number of prerequisites must be satisfied before the treatment can commence. Specifically, medications have to be ordered, a catheter has to be placed, and plasma has to be ordered and prepared. Accordingly, because those prerequisites had not been satisfied when Zurawski received the phone call regarding Matthew's plasmapheresis treatment, Dyer testified that Zurawski did not violate the standard of care by going to Good Samaritan Hospital to perform a phlebotomy procedure. Dyer further testified that Zurawski did not violate the applicable standard of care when she went to her residence in Willowbrook, Illinois, immediately after the phlebotomy because Matthew "was not yet ready for the treatment to be done." Notwithstanding the fact that Matthew's plasmapheresis treatment was considered an "emergency," Dyer reiterated that the standard of care did not require Zurawski to go to Advocate until all of the prerequisites for the treatment were satisfied. She emphasized that "the things that had to be ready were things that were outside of Ms. Zurawski's control. They were not tasks that she herself could complete."

¶ 55      After hearing the aforementioned testimony as well as the arguments of the parties, the jury commenced deliberations and ultimately returned with its verdict. The jury found in favor

of Doctors Rausch and Crowley and against Advocate, AES, and Zurawski. Plaintiff was awarded damages in the amount of $12,261,131. Advocate subsequently settled with plaintiff and defendants AES and Zurawski filed a posttrial motion challenging the verdict. Following a hearing, the circuit court denied defendants' post-trial motion. In doing so, the court stated: "This case was probably the clearest case of a deviation from the standard of care by a defendant that the Court has seen in its 50 to 100 medical malpractice cases." This appeal followed.

¶ 56                                    ANALYSIS

¶ 57        On appeal, defendants AES and Zurawski first contend that the circuit court erred in denying their motion for a judgment *n.o.v.* They argue that plaintiff failed to introduce any competent evidence that Zurawski or AES breached the applicable nursing standard of care and failed to prove that Zurawski's conduct proximately caused Matthew's death. Alternatively, they suggest that the verdict is against the manifest weight of the evidence.

¶ 58        Plaintiff responds that the evidence presented at trial established that Zurawski's failure to promptly travel to Advocate hospital to perform Matthew's plasmapheresis treatment both deviated from the standard of care and proximately caused his death. Accordingly, plaintiff argues that the defendants' efforts to challenge the verdict are without merit.

¶ 59        A motion for a judgment *n.o.v.* should only be granted in limited circumstances, such as when the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 504 (1967). When reviewing a ruling on a motion for a judgment *n.o.v.*, a reviewing court will not reweigh the evidence or evaluate the credibility of the witnesses, as these functions are within the unique province of the jury. *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208 Ill. 2d 259, 274 (2003); *Drakeford v.*

*University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 7. Ultimately, the standard for entry of a judgment *n.o.v.* is "high" (*York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995))) and is "limited to extreme situations only" (internal quotation marks omitted) (*Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 548 (2005) (quoting *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000))). Indeed, a motion for a judgment *n.o.v.* may not be granted simply because a verdict is against the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). A judgment *n.o.v.* is also not appropriate "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* In addition, a judgment *n.o.v.* is "not appropriate if 'reasonable minds might differ as to the inferences or conclusions to be drawn from the facts presented.' " *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 116 (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). When reviewing a circuit court's ruling on a motion for judgment *n.o.v.*, the evidence must be considered in the light most favorable to the party opposing the motion. *Thacker v. UNR Industries Inc.*, 151 Ill. 2d 343, 353-54 (1992); *Ramirez*, 2013 IL App (1st) 123663, ¶ 116. A motion for a judgment *n.o.v.* presents a question of law as to whether there was a complete failure to substantiate a key element of the plaintiff's case, and as such, the circuit court's ruling on such a motion is subject to *de novo* review. *York,* 222 Ill. 2d at 178; *McDonald v. Northeast Illinois Regional Commuter R.R. Corp.*, 2013 IL App (1st) 102766, ¶ 20.

¶ 60    To prevail on a medical negligence claim, it is incumbent upon the plaintiff to establish: (1) the standard of care against which the medical professional's conduct is to be measured; (2) a

negligent failure by the medical professional to comply with that standard of care; and (3) that the medical professional's negligent conduct proximately caused the injuries that the plaintiff seeks to redress. *Neade v. Portes*, 193 Ill. 2d 433, 443-44 (2000); *Purtill v. Hess*, 111 Ill. 2d 229 241-42 (1986); *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 292 (2008). Unless the medical professional's negligence is so grossly apparent or the treatment at issue is so common that it is considered to be within the common knowledge of a layperson, expert medical testimony is required to establish the applicable standard of care and the medical professional's deviation therefrom. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004); *Purtill*, 111 Ill. 2d at 242.

¶ 61      Here, defendants argue that plaintiff failed to present competent evidence to establish the standard of care against which Zurawski's conduct was to be measured or that her conduct proximately caused Matthew's death. We will address each of these arguments in turn.

¶ 62                          Standard of Care

¶ 63      Defendants first contend that Deborah MacVean, the expert plaintiff relied upon to establish the requisite standard of nursing care, was not qualified to offer such testimony. Absent any admissible "expert testimony on which to base a judgment against them," defendants argue that they are necessarily entitled to a judgment *n.o.v.*

¶ 64      As a general rule, "[a] person will be allowed to testify as an expert if [her] experience and qualifications afford [her] knowledge that is not common to laypersons, and where [her] testimony will aid the trier of fact in reaching its conclusions." *Thompson v. Gordon,* 221 Ill. 2d 414, 428 (2006). With respect to medical expert testimony in particular, there are two foundational requirements: "the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify" and "the expert must be familiar with the methods, procedures and treatments ordinarily observed by other health-care providers

in either the defendant's community or a similar community." *Sullivan*, 209 Ill. 2d at 114-15 (citing *Jones v. O'Young*, 154 Ill. 2d 39, 44 (1992), and quoting *Purtill*, 111 Ill. 2d at 242-43). Once these foundational elements are met, the circuit court is afforded the discretion to allow the healthcare professional to provide testimony about the applicable standard of care (*Willaby v. Bendersky*, 383 Ill. App. 3d 853 (2008)) and the court's decision will not be reversed absent an abuse of discretion (*Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006); *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 157). The abuse of discretion standard is the most deferential standard of review (*Kayman v. Rasheed*, 2015 IL App (1st) 132631, ¶ 68) and as such, a ruling will only be deemed an abuse of discretion where it is unreasonable and arbitrary or where no reasonable person would take the view adopted by the circuit court (*Petraski v. Thedos*, 382 Ill. App. 3d 22, 27 (2008); *Bangaly*, 2014 IL App (1st) 123760, ¶ 157).

¶ 65        In this case, there is no dispute that Nurse MacVean held the requisite nursing license to satisfy the first foundational element as she testified that she worked in the nursing profession for more than 35 years. There is similarly no dispute that Nurse MacVean lacked familiarity and experience with TTP patients and plasmapheresis; rather, her areas of practice included intensive care nursing and oncology nursing. Although defendants argue that this lack of experience and familiarity precluded MacVean from offering standard of care testimony in this case, we disagree. Nurse MacVean's testimony was not offered by plaintiff to contest the quality or nature of Matthew's plasmapheresis treatment. Indeed, plaintiff's negligence claim against defendants did not pertain to quality of the plasmapheresis care defendants provided; rather, it was premised on defendants' failure to provide *any* plasmapheresis treatment at all. Therefore, the fact that MacVean was not a plasmapheresis nurse did not preclude her from offering testimony about basic nursing protocols, proper communications between nurses and other health

care providers and the standard of care applicable to nurses who receive STAT orders, areas in which she was familiar. See *Jones*, 154 Ill. 2d at 43 ("Whether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation."); see also *Silverstein v. Brander*, 317 Ill. App. 3d 1000, 1008 (2000) (finding that an internist could offer standard of care testimony in a case against a defendant physiatrist where the testimony pertained solely to the physiatrist's medical management of the patient, an area in which the internist "demonstrated adequate expertise"). Accordingly, we find defendants' claim that MacVean lacked the requisite experience and knowledge to provide standard of care testimony to be without merit.

¶ 66        Turning to the testimony that MacVean did provide, we further find that defendants' contention that plaintiff failed to present admissible evidence to establish the applicable standard of care and Zurawski's breach thereof, to be similarly without merit. Relying on her years of experience as a practicing nurse, MacVean testified that reasonable standards of nursing care as well as AES's own policies required Zurawski to respond "without delay" to Advocate once she was dispatched to provide Matthew's plasmapheresis treatment. In doing so, MacVean emphasized that "it was an emergency procedure and she needed to get there." Accordingly, she testified that Zurawski deviated from the standard of care when she traveled to Good Samaritan Hospital to provide a routine phlebotomy and then to her residence instead of responding directly to Advocate as Nikolla and Doctors Hamad and Murathanun expected her to do. MacVean further testified that Zurawski's belief that Matthew's catheter was not in place did not excuse her failure to report directly to Advocate following her dispatch. She explained: "in an emergency the usual order of events don't always happen" and that a nurse has to respond "as soon as

possible without any delay *** for the good of the patient and the doctors' orders."  Given MacVean's testimony, we cannot agree with defendants that plaintiff failed to provide evidence to establish the applicable standard of care and defendants breach of that care, both of which are necessary elements in a medical negligence claim.

¶ 67     Even if we were to find MacVean's testimony insufficient to establish the applicable standard of care and breach thereof, we would still be unpersuaded that a judgment *n.o.v.* was warranted in this care.  As plaintiff correctly observes, Illinois courts have recognized that expert medical testimony is not required where a defendant health-care provider's conduct is so grossly negligent that a layperson would understand that the conduct deviated from the standard of care expected of a medical professional without the assistance of an expert.  See, *e.g., Heastie v. Roberts*, 226 Ill. 2d 515, 554-55 (2007) (finding that the plaintiff was not required to call a medical expert to testify  that the requisite standard of care requires medical personnel to perform a contraband search on any agitated patient prior to restraining and isolating that patient, reasoning:  "Whenever a patient is so agitated that he poses a danger to himself and others, as the plaintiff in this case unquestionably was, basic common sense dictates that before he is tied down and left alone, any implements he could use to harm himself or facilitate his escape should be removed from his person. *** One need not be a doctor, a nurse or any other kind of health provider to appreciate these risks."); *Willaby*, 383 Ill. App. 3d at 865-66 (finding that the plaintiff was not obligated to present a medical expert to testify that standard of care requires medical personnel to keep an accurate count of sponges used during surgery to prevent a sponge from being left in a patient's body because a layperson could easily understand that the failure to do so constituted gross negligence).  Arguably, Zurawski's conduct in failing to report to Advocate to perform a procedure that she understood to constitute an emergency until six hours after being

directed to do so was so grossly negligent that expert witness testimony regarding the requisite standard of care was not even required in the instant case.

¶ 68                                                  Proximate Cause

¶ 69        Defendants nonetheless argue that they are entitled to a judgment *n.o.v.* because plaintiff "failed to prove that Zurawski's conduct was a proximate cause of [Matthew's] death." Specifically, they argue that "even if Nurse Zurawski had arrived at Advocate within an hour of the initial call and set up for plasmapheresis within an hour of that, as plaintiff's nursing expert testified she should have, there was no evidence that Zurawski would have been able to administer plasmapheresis at any time before [Matthew's] death. The events in [Matthew's] final hours make clear that there was no opportunity to perform plasmapheresis that were outside of Zurawski's control and that were exclusively within Advocate's control."

¶ 70        In medical malpractice cases, the element of proximate cause must be established through expert testimony to a reasonable degree of medical certainty. *Simmons v. Garces*, 198 Ill. 2d 541, 556 (2002); *Buck v. Charletta*, 2013 IL App (1st) 122144, ¶ 59. To establish proximate causation, the plaintiff must prove that the defendant's negligence " 'more probably than not' " caused the plaintiff's injury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). Proximate cause may be established where the defendant's conduct "increased the risk of harm" to the patient or "lessened the effectiveness" of the patient's treatment. *Id*. at 105. In order to do so, the "plaintiff does not need to present unequivocal or unqualified evidence of causation but can meet his burden through the introduction of circumstantial evidence from which a jury may infer other connected facts which usually reasonably follow according to *** common experience." (Internal quotation marks omitted.) *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 549 (2005) (quoting *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 357 (1992)). The causal connection,

however, "must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006). At the same time, a plaintiff is "not required to show in absolute terms that a different outcome would have occurred, as such certainty is never possible." *Wodziak v. Kash*, 278 Ill. App. 3d 901, 913 (1996). Generally, "[i]ssues involving proximate cause are fact specific and therefore uniquely for the jury's determination." *Holton*, 176 Ill. 2d at 107.

¶ 71　　　　　Here, Doctor Crowther, the hematologist who testified on behalf of plaintiff, stated unequivocally that plasmapheresis is essential to treat TTP and that "without effective plasmapheresis, patients with TTP routinely die from this disease." He further testified that had Matthew received his first plasmapheresis treatment by as late as 9 p.m. on October 25, 2009, he would have likely survived. This is true notwithstanding the fact that Matthew had damage to his organ systems and "somewhat variable" blood pressure at that time. Doctor Crowther specifically quantified Matthew's chances for survival as "greater than 50 percent" had Zurawski promptly arrived at Advocate and provided a timely plasmapheresis treatment. He specifically emphasized that plasmapheresis could not have been administered to Matthew in her absence.

¶ 72　　　　　Defendants, in turn, presented contradictory testimony from Doctor Neely who opined that because Matthew was already experiencing multi-system organ failure by the time he was properly diagnosed with TTP, a plasmapheresis treatment "would [not] have been beneficial to him at that time." Doctor Neely further testified that a plasmapheresis treatment "would have accelerated his instability" and could not have been administered safely. Both Doctor Neely and defendants' other expert, Doctor Soff, testified that nothing that Zurawski or AES did or did not do contributed to, or caused, Matthew's death.

¶ 73　　　　　Viewing the aforementioned testimony in the light most favorable to plaintiff (*Pedrick*, 37 Ill. 2d at 504), we find that the jury had sufficient evidence with which to conclude that

defendants proximately caused Matthew's death. Plaintiff's expert acknowledged Matthew's precarious physical health at the time of his diagnosis, but opined that that his chances for survival would have been "greater than 50 percent" had Zurawski delivered a timely plasmapheresis treatment. Defendants' experts, in turn, opined that plasmapheresis would not have saved Matthew because he was already experiencing multi-system organ failure at the time of his diagnosis and that no actions or inactions on the part of AES or Zurawski contributed to or caused Matthew's death. Faced with contradictory testimony from multiple experts, it was the jury's responsibility to consider those discrepancies and evaluate the credibility of those witnesses and it is not this court's duty to reweigh the evidence and make our own determinations. *Maple*, 151 Ill. 2d at 451-52; *Knauerhaze*, 361 Ill. App. 3d at 550. We acknowledge that defendants cite to a number of shortcomings on the part of Advocate, which would have purportedly precluded Zurawski from performing plasmapheresis even if she had traveled immediately to Advocate after she was dispatched by Nikolla. Specifically, they cite to Advocate's delay in transferring Matthew to the MICU, the blood bank's delay in thawing FFP, and Matthew's deteriorating and unstable physical state as conditions which would have prevented her from administering his treatment. The fact that plaintiff alleged, and the jury found, Advocate negligent, however, does not preclude a finding that defendants also proximately caused Matthew's death. Applying the standard of review applicable to the denial of a judgment *n.o.v.*, we are unable to conclude that the jury's verdict is unfounded or that the evidence overwhelmingly favors defendants that its verdict cannot stand. *Maple*, 151 Ill. 2d at 451-52; *Knauerhaze*, 361 Ill. App. 3d at 550. Accordingly, the circuit court did not err in denying defendants' motion for a judgment *n.o.v.*

¶ 74      We similarly reject defendants' alternative argument that the jury's verdict is against the manifest weight of the evidence. As the trier of fact, it is the jury's role to weigh the evidence, make credibility determinations, and to resolve conflicts in expert testimony. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006); *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 60. When reviewing a jury verdict, a reviewing court may not substitute its judgment for that of the trier of fact and will not that disturb the verdict unless it is against the manifest weight of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 34 (2003); *Maple v. Gustafson*, 151 Ill. 2d 445 (1992). A verdict is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where the jury's findings appear to be unreasonable, arbitrary and not based on the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38; *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995).

¶ 75      As set forth above, the jury heard testimony from various qualified experts who provided their opinions about the standard of care and whether or not a timely plasmapheresis treatment could have saved Matthew's life given that he was experiencing multi-system organ failure at the time of his TTP diagnosis. Given the verdict, the jury evidently found plaintiff's experts more credible and this court cannot usurp the function of the jury and substitute our judgment for that of the trier of fact. *York*, 222 Ill. 2d at 179. The mere fact that the jury resolved the conflicting testimony against defendants does not render the verdict in this case against the manifest weight of the evidence. See, *e.g., Snelson*, 204 Ill. 2d at 35-36 (rejecting the defendant's claim that the verdict was against the manifest weight of the evidence where the case involved a "classic battle of the experts" in which the jury resolved the discrepant testimony in favor of the plaintiff); *Sottile v. Carney*, 230 Ill. App. 3d 1023, 1031 (1992) (rejecting the plaintiff's claim that the jury

verdict was against the manifest weight of the evidence where the "medical expert testimony [was] merely conflicting"). Ultimately, following our review of the trial record, we are unable conclude that the jury's verdict is arbitrary, unreasonable and not based on the evidence. We therefore reject defendants' argument that the verdict is against the manifest weight of the evidence.

¶ 76                                    Rulings on Expert Testimony

¶ 77        Defendants next contest several of the circuit court's rulings pertaining to the appropriate scope of expert witness testimony. First, they argue that the court abused its discretion when it allowed plaintiff's causation expert, Doctor Crowther, to testify about the standard of care applicable to plasmapheresis nurses.

¶ 78        It is well-established that the admissibility of evidence is within the discretion of the circuit court. *Snelson*, 204 Ill. 2d at 33; *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 155 (1997). More specifically, as set forth above, the circuit is afforded the discretion whether or not to allow a healthcare professional to provide expert testimony pertaining to the applicable standard of care. *Thompson*, 221 Ill. 2d at 428.

¶ 79        In this case, prior to Doctor Crowther's testimony, defendants filed a motion *in limine* seeking to bar Doctor Crowther from offering testimony pertaining to the standard of care applicable to plasmapheresis nurses. After hearing arguments, the circuit court properly granted that motion. See *Sullivan*, 209 Ill. 2d at 123-24 (upholding a circuit court's ruling that a doctor was not competent to provide nursing standard of care testimony because nursing is unique school of medicine that requires a separate license). In doing so, however, the court ruled that Doctor Crowther could discuss personal practice and experience to provide the basis for his opinions.

¶ 80          In accordance with the circuit court's ruling, Doctor Crowther relied upon his personal experiences with plasmapheresis nurses to provide testimony about what Doctor Hamad would have expected after contacting AES and placing the order for Matthew's plasmapheresis treatment. Specifically, he testified that once Doctor Hamad concluded his phone call and told Doctor Murathanun that "the plasmapheresis people were on the way," Doctor Hamad would have expected that Zurawski was actually on her way, that she would be arriving shortly and would be able to start Matthew's plasmapheresis treatment quickly. Given the time of the phone call and his expectation that nurses respond immediately to emergency calls, Doctor Crowther testified that Doctor Hamad would have expected Zurawski to arrive around 6 p.m. Moreover, based on his prior experiences with, and expectations of, plasmapheresis nurses, Doctor Crowther further testified that Advocate's doctors would have expected that once Zurawski arrived, she would have set up the machinery and made arrangements to ensure that all the necessary supplies, including plasma, were available for her to begin the treatment. Although defendants argue that such testimony "violated both the spirit and letter of the order *in limine*," we do not find that Doctor Crowther's testimony constituted improper standard of care evidence; rather such testimony was, as the circuit court found, relevant to provide the appropriate contextual background for his opinions. However, to the extent that any of Doctor Crowther's testimony could be deemed improper standard of care evidence, the testimony was necessarily harmless given it was duplicative of that offered by MacVean. See, *e.g., Steele v. Provena Hospitals,* 2013 IL App (3d) 110374, ¶ 107 (recognizing that improperly admitted testimony is harmless where it is duplicative of other properly admitted testimony) see also *Willaby*, 383 Ill. App. 3d at 862 (recognizing the general rule that an improper comment that violates a motion *in*

*limine* will only constitute reversible error where the other party has been substantially prejudiced).

¶ 81        Defendants next argue that the circuit court "abused its discretion by limiting various opinions of AES's and Nurse Zurawski's hematology expert, Doctor Soff, which denied them the opportunity to rebut Doctor Crowther's testimony." Defendants first argue that the circuit court erred when it precluded Doctor Soff from testifying that plasmapheresis would not have saved Matthew because he had already suffered extensive tissue damage and multi-organ failure at the time of his diagnosis. Although its critical care expert, Doctor Neely, had offered the same opinion, defendants argue that the circuit court erred in barring Doctor Soff's testimony as cumulative given that the two doctors were from different specialties.

¶ 82        The decision whether to exclude cumulative evidence is a matter that is within the sound discretion of the circuit court. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002). This discretion includes the ability to limit the number of expert witnesses a party may call upon to testify and to bar cumulative testimony. *Dillon*, 199 Ill. 2d at 495; *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 155 (1997).

¶ 83        At trial, the jury heard Advocate's expert, Doctor Hoffman, and defendants' critical care expert, Doctor Neely, testify that plasmapheresis could not have saved Matthew's life because he had already suffered irreversible tissue damage and multi-system organ failure at the time of his diagnosis. When defendants sought to elicit the same testimony from Doctor Soff, plaintiff objected arguing that the jury had already heard the same opinion twice and that Doctor Soff's testimony would constitute cumulative evidence. The circuit court agreed, but permitted him to testify that no action or inaction on the part of Zurawski or AES contributed to or caused Matthew's death. We find that this constitutes error. Although Advocate's hematology expert

provided the same testimony, AES was entitled to call its own hematology expert to rebut the testimony of plaintiff's expert. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 36 ("When multiple defendants are named in a case, each defendant is entitled to present an expert in defense of the case." (citing *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 383 (2000)). Moreover, given that Doctor Soff's specialty was hematology and Doctor Neely's specialty was critical care, Doctor Neely's testimony should not have precluded defendants from calling upon Doctor Soff to render the same opinion. *Id*. ¶ 35 (finding that the circuit court did not err in allowing the defendant to call three different medical experts who offered the same opinion because the doctors all had different specialties).

¶ 84    Although we agree with defendants that the circuit court erred in limiting Doctor Soff's testimony, we do not find that the error constitutes prejudicial error warranting a new trial. As we just observed, the jury heard defendants' other expert, Doctor Neely, provide the same opinion and it is well-established that any "[e]rror in the admission or exclusion of evidence is harmless if the facts involved are strongly established by other competent evidence." *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 483 (1985). Moreover, Doctor Soff was permitted to offer his ultimate opinion that nothing Zurawski or AES did contributed to or caused Matthew's death. Accordingly, we find that the error was ultimately harmless.

¶ 85    Finally, defendants argue that circuit court erred in preventing Doctor Soff from testifying that a reasonable hematologist would have deferred to the judgment of an ICU doctor as to whether the patient was stable enough to receive plasmapheresis. Although the circuit court found that such testimony was irrelevant, defendants argue that this evidence was relevant and admissible to rebut the testimony of Doctor Crowther that a reasonable hematologist would have ordered plasmapheresis to proceed notwithstanding Matthew's medical instability.

¶ 86    Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 74 (2003). The relevance and admission of such evidence is left within the sound discretion of the circuit court. *Neade v. Portes*, 193 Ill. 2d 433, 450 (2000); *Smith*, 339 Ill. App. 3d at 74.

¶ 87    In this case, Doctor Murathanun, the MICU resident who treated Matthew, testified that he believed a patient needed to be medically stable in order to receive a plasmapheresis treatment and that Matthew was medically unstable when he was transferred to Advocate's MICU. However, he further testified that if Zurawski had arrived before Matthew coded, he would have contacted Doctor Hamad, Advocate's hematologist, to inquire whether plasmapheresis should proceed. Plaintiff's hematologist expert, Doctor Crowther, subsequently testified that a reasonable hematologist would have administered plasmapheresis notwithstanding Matthew's physical condition because without plasmapheresis, a TTP patient necessarily dies. Thereafter, defendants sought to elicit testimony from their own hematology expert, Doctor Soff, that a reasonable hematologist would not necessarily order plasmapheresis to proceed; rather, he would defer to the judgment of a MICU doctor. The circuit court, however, ultimately ruled that such testimony was not relevant after the following exchange:

        "[DEFENSE COUNSEL]: I think [Doctor Soff] should be able to say that a reasonable hematologist might would [*sic*] defer to the judgment of the ICU doctor. In other words, it's an ICU decision, not a hematology decision.

        [COURT]: Okay. What's the relevance of that?

        [DEFENSE COUNSEL]: The relevance is that there's a claim that had [Zurawski] been there, Doctor Murathanun would have called the hematologist and a reasonable

hematologist would have said, 'Go ahead with the treatment.' This doctor is saying that a reasonable hematologist would defer back to the intensive care management.

[COURT]: So this doctor is going to testify that Dr. Murathanun would have said to the hematologist, 'I'm deferring to you' and the hematologist would have said, 'I'm deferring to you.'

[DEFENSE COUNSEL]: That's right. It's an ICU call.

[THE COURT]: So how does that help the jury decide anything?

[DEFENSE COUNSEL]: It counters Crowther's comment that a reasonable hematologist would have said 'Go ahead' in the absence of Hamad actually testifying as to what he would have done in that situation.

[THE COURT]: The objection is sustained on relevance."

¶ 88        After reviewing the record, we cannot conclude that the circuit court abused its discretion. Although defendants suggest otherwise, Doctor Murathanun, did not testify that he would have delayed plasmapheresis treatment until Matthew became stable; rather, he clearly stated that if Zurawski had been present he would have contacted Doctor Hamad and would have deferred to his judgment as to whether the plasmapheresis treatment should proceed. Given Doctor Murathanun's testimony, the opinion that defendants sought to elicit from Doctor Soff—that a reasonable hematologist would defer to the opinion of the MICU doctor—cannot be deemed relevant. Essentially, Doctor Soff's testimony would have had Doctors Murathanun and Hamad deferring to each other about whether to provide Matthew with plasmapheresis without any specific end result. The circuit court recognized this circle of deference would have yielded no relevant evidence and we find no abuse of discretion.

¶ 89                                CONCLUSION

¶ 90       Accordingly, the judgment of the circuit court is affirmed.

¶ 91       Affirmed.