2026 IL App (1st) 250079-U

FIRST DISTRICT,
SIXTH DIVISION
April 17, 2026

No. 1-25-0079

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MIGUEL OCHOA, as Independent Administrator of the ESTATE OF ANA OCHOA, deceased, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) ) | Cook County, Illinois. |
| v. | ) ) | No. 18 L 9286 |
| MATTHEW O'TOOLE, M.D., MARK KUSHNER, M.D., and SHARON SHUNG, M.D., | ) ) ) | Honorable Ronald F. Bartkowicz, Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1　　*Held:* In this medical malpractice case, the jury returned a verdict for defendants. We hold that (1) although expert's brief reference to what "the panels" recommend was hearsay, it was not so prejudicial as to warrant reversal; (2) the trial court did not abuse its discretion in its remaining evidentiary rulings; (3) plaintiff showed no prejudice from the court's comment permitting the jury to discuss the case before the close of evidence; and (4) the verdict was not against the manifest weight of the evidence.

¶ 2       On August 23, 2016, Ana Ochoa was admitted to the emergency department at the University of Illinois Hospital in Chicago. On August 28, while still at the hospital, Ana died from septic shock secondary to E. coli bacteremia. Ana's son Miguel Ochoa, as the administrator of Ana's estate, brought a medical malpractice suit against Drs. Mark Kushner, Matthew O'Toole, and Sharon Shung. Ochoa alleged that Ana had been suffering from an E. coli urinary tract infection (UTI) beginning on July 27 that progressed until it caused her death, and that defendants fell below the standard of care by failing to treat the UTI through consultation with an infectious disease specialist or the ordering of appropriate antibiotics.

¶ 3       Following a jury trial, judgment was entered in favor of defendants. Ochoa appeals, and we affirm.

¶ 4                        I. BACKGROUND

¶ 5             A. Ana's Hospitalizations in July and August 2016

¶ 6       Ana, who was 64 years old, suffered from membranous glomerulonephritis, a chronic autoimmune kidney disease. Under the care of nephrologist Dr. Claudia Lora, Ana was on multiple medications to suppress her immune system and reduce inflammation.

¶ 7       On July 27, 2016, Ana was presented to the University of Illinois Hospital in Chicago with complaints of back, flank, and leg pain, as well as swelling in the legs and shortness of breath when walking. None of the defendant physicians provided care to her during this hospital visit. A urine culture taken on July 27 tested positive for E. coli bacteria. On August 4, Ana reported pain just above her bladder area, and a second urine culture was taken. She was prescribed a three-day course of antibiotics and released later that day. The August 4 urine culture returned a result of "no predominant organism with a mixture of gram-positive and gram-negative organisms."

¶ 8    On August 12, Ana returned to the hospital with swelling in her legs that made walking difficult. Defendant Mark Kushner, Ana's attending internal medicine physician, examined Ana on the morning of August 13 and diagnosed her with anasarca (total body swelling) due to excessive water retention caused by her kidney disease. He did not suspect her of having a UTI because she displayed "[n]o fever, chills, abdominal pain or complaints of urinary dysuria or any other urinary complaints." Nor did he consult an infectious disease specialist or order antibiotics.

¶ 9    The renal team, headed by Dr. Lora, also examined Ana. On August 16, Ana complained of left abdominal pain, a complaint consistent with a UTI, prompting the renal team to recommend a urinalysis and urine culture. Per their recommendation, Dr. Kushner ordered the tests. The urine culture showed no predominant organism with a mix of gram-positive and gram-negative organisms. As for the urinalysis, Dr. Kushner did not think it indicated a UTI because her levels of nitrates and white blood cells were not elevated.

¶ 10    Ana's condition improved with the successful removal of eight liters of excess fluid. She was prescribed medication to treat her excess fluid retention and was discharged from the hospital on August 20. A urine culture was collected on August 22. The results showed no bacterial growth.

¶ 11    On August 23, Ana went to the renal clinic for a follow-up appointment. During this visit, she displayed short breath, fatigue, elevated heart rate, and low blood pressure, prompting Dr. Lora to send her to the emergency department. Based on Dr. Lora's notes, the primary concern was a pulmonary embolism, but there was also "the possibility of infection since she is immunocompromised."

¶ 12    The emergency room physicians evaluated Ana and admitted her. Later that evening, defendant Matthew O'Toole, a second-year resident, performed a history and physical for Ana's

admission to the hospital. He was working the night shift and processing new admissions, most of whom came through the emergency department. When his shift ended in the morning, he would tell the attending physician about the new admissions and then have no further involvement in their care. He had no independent recollection of admitting Ana but, based on the records he saw in connection with the lawsuit, he did not believe she displayed any signs of a systemic infection. Ana's condition was stable until 7 a.m., when Dr. O'Toole signed off her care to her attending physician, Dr. Hinkley.

¶ 13    Ana showed "some gradual improvement" over the next few days, and the plan was to transfer her to a rehab facility. On August 27, while being prepared for discharge, she was given a blood transfusion. Afterwards she developed a fever and a rapid heart rate and respiratory rate. Defendant Sharon Shung, a third-year resident and a member of the rapid response team, was called to her room at 7 p.m. Dr. Shung found the "most likely diagnosis" was a transfusion reaction based on the timing of the symptoms. Due to the possibility of infection and Ana's immunocompromised state, Dr. Shung ordered an infectious workup with blood cultures, but she did not order antibiotics. In retrospect, Dr. Shung acknowledged that Ana was likely to have sepsis due to systemic E. coli infection on August 27. However, she maintained that Ana also had a transfusion reaction that was at least a partial cause of her symptoms.

¶ 14    At 1:30 a.m. on August 28, Dr. Shung responded to Ana's room a second time because Ana had developed a fever again, her blood pressure was low, and her condition had not improved as was expected from a transfusion reaction. Additionally, some of her labs had come back showing elevated levels of lactic acid, which could be a sign of shock. Due to concern about septic shock, Dr. Shung ordered antibiotics and transferred Ana to the intensive care unit.

The antibiotics were not administered until hours later at 4:29 and 4:33 a.m. At around 5 a.m., Ana went into cardiac arrest and died.

¶ 15 An autopsy showed Ana's cause of death was septic shock secondary to E. coli bacteremia. The blood culture ordered by Dr. Shung on August 27, which did not come back until after Ana died, grew out E. coli bacteria.

¶ 16 On August 27, 2018, Ochoa filed a medical malpractice suit seeking damages for his mother's death. In his amended complaint, Ochoa alleged defendants' actions fell below the standard of care as follows:

- During Ana's hospital stay from August 12 to August 20, 2016, Dr. Kushner did not order an infectious disease consultation and did not prescribe appropriate antibiotics for her E. coli infection;

- On August 23, Dr. O'Toole did not recognize that Ana had a persistent bacterial infection and did not order appropriate antibiotics or an infectious disease consultation; and

- On August 27, Dr. Shung was aware of the possibility of infection but did not immediately order antibiotics.

The case proceeded to a jury trial at which both sides proffered experts on the standard of care.

¶ 17                               B. Ochoa's Medical Experts

¶ 18 Ochoa called Dr. David Goldstein, an internal medicine physician, who testified that Ana's immune system was compromised due to medications she was taking for her kidney disease. When a patient is immunocompromised, bacteria can enter their system without the body being able to muster an immune response. This can allow bacteria to reach high, potentially lethal levels while preventing the body from displaying symptoms (*e.g.*, pain or fever) that would

ordinarily serve as warning signs of infection. UTIs can present with or without symptoms, and Dr. Goldstein saw patients with asymptomatic UTIs thousands of times throughout his career.

¶ 19     Dr. Goldstein testified that Ana's July 27 urine culture grew E. coli consistent with a UTI. Her August 4 urine culture tested positive for bacteria, with a mixture of gram-positive and gram-negative organisms, but not in enough quantity to constitute a UTI. Dr. Goldstein opined the August 4 culture likely contained E. coli, which is a gram-negative organism.

¶ 20     According to Dr. Goldstein, the standard of care required Dr. Kushner to consult an infectious disease specialist during Ana's August 12 hospital stay, due to her immunocompromised state, the fact the August 4 culture showed mixed organisms in her urine, and the abdominal pain she reported on August 16. Dr. Goldstein further testified that when Dr. O'Toole examined Ana on August 23, he should have considered the possibility of sepsis based on her symptoms and immunocompromised state. He also should have obtained blood and urine cultures and started Ana on broad-spectrum antibiotics immediately, instead of waiting for culture results in two to three days. Dr. Goldstein opined that if Ana had been given antibiotics during her August 12 hospital stay and on August 23, she would not have developed severe sepsis or died. Lastly, Dr. Goldstein testified that when Dr. Shung saw Ana at 7 p.m. on August 27, the standard of care required immediately starting Ana on broad-spectrum antibiotics, particularly since Dr. Shung was aware of the possibility of infection.

¶ 21     Dr. Howard Pitchon, an infectious disease specialist, was Ochoa's causation expert. He testified that a reasonably careful infectious disease physician would have recognized Ana's immunocompromised state and treated her with broad-spectrum antibiotics during her August 12 hospital stay, which would have saved her life. Furthermore, if urine or blood cultures had been

obtained on August 23, they would have shown the presence of an infectious process, and broad-spectrum antibiotics given on August 23 would have saved Ana's life.

¶ 22    Dr. Pitchon testified that around the time of the rapid response call on August 27, Ana's condition progressed to severe sepsis. He explained that sepsis is the body's extreme systemic reaction to an infection. Once sepsis becomes severe, there is usually a window of "a few hours" in which antibiotics can save the patient's life, and every hour of delay raises the mortality rate. If Ana had been given broad-spectrum antibiotics at 7 p.m. on August 27, she would have had "a greater than 50 percent chance of survival." Instead, there was a five or six-hour delay in administering antibiotics, which led to her succumbing to her severe sepsis. Reviewing the culture results, Dr. Pitchon testified that the E. coli in Ana's July 27 urine culture was the same organism as in her August 27 blood culture.

¶ 23    C. Defendants' Medical Experts

¶ 24    The defense called three experts. Dr. Scott Palmer, an internal medicine physician, opined that Ana never had a UTI. Although the July 27 culture showed the presence of E. coli, Ana had no symptoms of an UTI, which would be expected even in an immunocompromised patient. Ana likely had "asymptomatic bacteriuria" (the presence of bacteria in the urine without any infection), which is "effectively meaningless" and does not require treatment. Ana's August 4 culture, which showed no predominant organism, was inconsistent with a UTI. Dr. Palmer asserted the E. coli in the July 27 urine culture and the E. coli in the August 27 blood culture were unrelated since there was no evidence the E. coli in Ana's bloodstream on August 27 originated from the genitourinary system.

¶ 25    When Ana was presented to the hospital on August 12, she had no signs or symptoms of a UTI. Dr. Palmer testified that Dr. Kushner complied with the standard of care by recognizing

her fluid overload and adjusting her diuretics to remove the excess fluid. Observing that Dr. Lora's team ordered no infectious disease consultation or antibiotics, Dr. Palmer opined the standard of care did not require them.

¶ 26    Dr. Palmer further testified that Ana's examination by the emergency room physicians on August 23 showed no evidence of a UTI. In fact, her blood pressure improved spontaneously, which suggested her symptoms were not caused by an infection. In Dr. Palmer's opinion, the standard of care did not require Dr. O'Toole to order blood or urine cultures, antibiotics, or an infectious disease consultation given the absence of any indication of infection. At the end of Dr. O'Toole's shift, he signed off Ana's care to Dr. Hinckley, Ana's attending physician, who had the ultimate responsibility of determining what tests or consultations to order. Dr. Hinkley did not order any blood or urine cultures or antibiotics, nor did he note any suspicion of an infection.

¶ 27    Dr. Palmer also opined that Dr. Shung complied with the standard of care. Ana's condition during the 7 p.m. rapid response was consistent with a reaction to the blood transfusion. "At this juncture," Dr. Palmer said, "it's appropriate to get cultures, but it's not appropriate to launch antibiotics without evidence of infection." After that rapid response, Dr. Shung was not involved in Ana's care until she was called to her room a second time at 1:30 a.m. At that time, Dr. Shung appropriately evaluated Ana's new symptoms and ordered antibiotics.

¶ 28    Finally, Dr. Palmer opined that due to Ana's chronic kidney disease and low albumin level, she had a poor prognosis even before becoming septic. He estimated that, had she not become septic, Ana had a 60% chance of surviving the hospitalization and "her life expectancy would have been measured only in weeks."

¶ 29    Dr. John Segreti, an internal medicine and infectious disease physician, testified that Ana had asymptomatic bacteriuria during her July hospitalization based on the July 27 urine sample

and her absence of symptoms. Asymptomatic bacteriuria is very common and does not require treatment. Giving antibiotics for asymptomatic bacteriuria, even in immunocompromised patients, has no benefit and can cause drug side effects, allergic reactions, and C. difficile infection. Dr. Segreti further testified that E. coli "is a very common organism that just about every person is colonized with in their bowel." In most people, it does no harm "unless it gets out of the bowel and goes somewhere where it is not supposed to go."

¶ 30      Ana's August 4 urine culture grew out a mix of gram-positive and gram-negative organisms, which, in Dr. Segreti's opinion, indicated the culture was "contaminated." "You wouldn't use this culture to determine what to do with the patient," he said. "It is mainly based on symptoms." Likewise, Ana's August 16 urine culture also showed a mix of gram-positive and gram-negative organisms without a predominant organism. Dr. Segreti explained there are thousands of gram-negative organisms and "[t]here is nothing on this culture that says that the gram-negative organism was E. coli." Her August 22 urine culture was negative.

¶ 31      Dr. Segreti opined that there was no reason for a reasonably careful infectious disease physician to order antibiotics during Ana's August 12 admission since she had no symptoms of a UTI and the August 16 urine culture showed no predominant organism, a prerequisite to identifying an appropriate antibiotic. Dr. Segreti also opined that Ana did not have a UTI on August 23 and there was no reason to have given her antibiotics on August 23 or at any time until the night of August 27.

¶ 32      Dr. Segreti acknowledged that Ana was likely septic at 7 p.m. on August 23. However, he testified that giving her antibiotics at 7 p.m. would not have saved her life because it generally takes 24 to 48 hours for antibiotics to work against an E. coli bloodstream infection. He said the E. coli found in her blood at the time of her death was "[m]ost likely" not the same E. coli found

in her July 27 urine culture because it was a month later, "there are lots of different E. coli," and the autopsy showed no signs of urinary tract involvement. He could not say for sure how the E. coli entered her bloodstream, but the most likely medical explanation was that E. coli in her bowel "somehow" got through the wall of her colon. He concluded that nothing the defendants did or did not do contributed to Ana's death.

¶ 33    Dr. Martin Tobin is a critical care physician and pulmonologist with expertise in sepsis. Consistent with defendants' other experts, he testified that asymptomatic bacteriuria does not require treatment with antibiotics. Particularly with immunocompromised patients, "you have to be very careful with the use of antibiotics" because overexposure to antibiotics may result in "superinfection" with antibiotic-resistant bacteria. Additionally, both the August 4 and August 16 urine cultures "came back negative" for an infection. Mixed-organism cultures are "extremely common," and the quantity of bacteria was "nonsignificant." According to Dr. Tobin, the E. coli in Ana's August 27 blood culture was not the same bacteria in her July 27 urine culture based on the intervening negative urine cultures on August 4, 16, and 22.

¶ 34    Dr. Tobin opined that nothing the defendants did or did not do contributed to Ana's death. She did not suffer any injury during her August 12 admission under Dr. Kushner's care. On August 23, when she went to the emergency department, there was no indication that she was septic or had an infection. After Dr. O'Toole completed Ana's history and physical, he signed her care off to Dr. Hinkley. Lastly, on August 27, the symptoms that prompted the rapid response team call at 7 p.m. were consistent with a transfusion reaction, and, in Dr. Tobin's opinion, there was no indication that Ana was in septic shock. Ana's septic shock did not become evident until after midnight on August 28, by which time it was too late for antibiotics to save her.

¶ 35     The jury returned a verdict in favor of the defendants and against Ochoa, and the trial court entered judgment for the defendants. Following the denial of Ochoa's posttrial motion for a new trial, Ochoa timely filed this appeal.

¶ 36                                   II. ANALYSIS

¶ 37     In addition to arguing the jury's verdict was against the manifest weight of the evidence, Ochoa argues the trial court erred by (1) allowing testimony about the conduct of nondefendant doctors; (2) allowing defense experts Dr. Segreti and Dr. Palmer to cite Ana's August 22 urine culture as a basis for their opinions when such basis was not previously disclosed; (3) allowing defense expert Dr. Tobin to offer an undisclosed opinion; (4) allowing Dr. Tobin to bolster his opinion about the SIRS criteria with medical hearsay; (5) allowing opinion testimony from Dr. Tobin that was cumulative of defendants' other experts; (6) limiting testimony about the delay in administering antibiotics to Ana after 1:30 a.m. on the day of her death; and (7) permitting the jury to discuss the case amongst themselves before the close of evidence.

¶ 38     We consider these contentions in turn, keeping in mind that evidentiary rulings are generally left to the discretion of the trial court and will not be reversed absent an abuse of discretion, which occurs where no reasonable person would take the view adopted by the court. *Avila v. Chicago Transit Authority*, 2021 IL App (1st) 190636, ¶ 61.

¶ 39                         A. Actions of Nondefendant Doctors

¶ 40     Defendants elicited testimony that various nondefendant doctors did not order an infectious disease consultation and antibiotics for Ana, namely: (1) Dr. Lora's renal team, who saw Ana during her August 12 admission; (2) the emergency room physicians who decided to admit her on August 23; and (3) Dr. Hinckley, Ana's attending physician during her August 23

admission. Ochoa argues this testimony was irrelevant to the issue of defendants' negligence and should have been excluded.

¶ 41 Ochoa raised no objection to most of this testimony. On redirect examination of Dr. Tobin, when defense counsel asked whether Ana "was seen by multiple, multiple physicians, most of whom are not in this courtroom," Ochoa raised an objection solely as to form, but not relevance. Ochoa only raised a substantive objection during closing argument when defendants referenced the testimony about the acts of other physicians. Due to Ochoa's failure to raise contemporaneous objections to the testimony at issue, his claim of error is forfeited. *Ittersagen v. Advocate Health & Hospitals Corp.,* 2020 IL App (1st) 190778, ¶ 77 (plaintiff forfeited the issue by failing to object to the defense expert's initial testimony during direct examination).

¶ 42 Even absent forfeiture, we find no error in admitting the challenged testimony. "The determination of whether a doctor acted in compliance with the applicable standard of care is limited, by definition, to the circumstances with which he was confronted at the time the medical service was rendered." *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 61. The actions of other doctors who saw Ana at and around the same time as defendants are relevant to understanding these circumstances.

¶ 43 In *Steele*, the decedent died of chickenpox, and her family sued a physician who failed to diagnose her chickenpox. The physician sought to introduce evidence that four other physicians who treated the decedent after him also did not recognize her rash as chickenpox. *Id.* ¶¶ 13-18. We held it was an abuse of discretion to exclude this testimony, explaining: "The reasons for the failure of other doctors to diagnose chicken pox and underlying varicella zoster infection so close in time to [defendant's] treatment of [the decedent] is relevant and probative." (Emphasis omitted.) *Id.* ¶ 64. Similarly, the failure of other doctors to order an infectious disease

consultation and antibiotics for Ana so close in time to defendants' treatment of her is both relevant and probative.

¶ 44    Ochoa's cases cited on this issue are inapposite. In *Simpson v. Johnson*, 45 Ill. App. 3d 789, 796 (1977), it was improper for the defendant doctor to argue that plaintiff's injury was caused by an unknown accident for which there was no evidence in the record, "since it invited speculation by the jury on an issue without foundation in the evidence." In *Greco v. Orthopedic & Sports Medicine Clinic, P.C.*, 2015 IL App (5th) 130370, ¶¶ 25-30, it was improper for a lay witness to offer hearsay opinions on medical matters that were not supported by any competent expert testimony. By contrast, the testimony at issue here was given by qualified experts and was based upon the medical record. Admitting it was not an abuse of discretion.

¶ 45                 B. Dr. Segretti and Dr. Palmer's Testimony About the August 22 Culture

¶ 46    Rule 213(f)(3) provides that for each controlled expert witness, the party must identify "the conclusions and opinions of the witness and the bases therefor." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). An expert may not offer a new basis for a previously disclosed opinion for the first time at trial. *N. League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP*, 2018 IL App (1st) 172407, ¶ 53; *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 745 (2001). However, statements of fact are not subject to the disclosure requirements of Rule 213. *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 303 (2002) (doctor's testimony that patient had an infection "was not an opinion, but a factual statement and therefore not subject to Rule 213").

¶ 47    Here, the medical record reflects that Ana had an August 22 urine culture showing no bacterial growth. Defendants did not set forth the August 22 culture as a basis for Dr. Palmer and Dr. Segreti's opinions in their Rule 213(f)(3) disclosures, nor did the doctors mention that culture in their depositions.

¶ 48        At trial, Ochoa elicited detailed testimony from his expert, Dr. Pitchon, regarding the methodology used in Ana's August 22 urine culture. The trial court overruled the defense's Rule 213 objection, stating: "[B]ased upon his medical training and background, he is describing a particular procedure. I don't consider that to be a violation. *** No opinion given, okay." Similarly, the court permitted Dr. Palmer to testify that Ana's August 22 culture showed no growth of bacteria. The court overruled Ochoa's Rule 213 objection, stating the testimony was "simply a chronological fact." The court also permitted Dr. Segreti to testify over Ochoa's objection that Ana's August 22 culture was negative.

¶ 49        Based on our review of the record, the testimony of defendants' experts did not violate the disclosure requirements of Rule 213. Their statements were brief and purely factual in nature. Importantly, neither expert set forth the August 22 culture as a basis for their ultimate opinion that the E. coli in Ana's July 27 urine culture was not the same as the E. coli in her bloodstream on August 27. We hold the trial court did not abuse its discretion in permitting their testimony.

¶ 50                          C. Dr. Tobin's Testimony About Steroids

¶ 51        Ochoa argues the trial court erred by allowing Dr. Tobin to offer an undisclosed opinion that stopping Ana's steroid medication caused complications during her last hospital admission, which ultimately led to her death. Defendants argue that Ochoa mischaracterizes the testimony and that Dr. Tobin "offered no such opinion."

¶ 52        The record reflects that Ana had been taking the steroid prednisone for her kidney disease, but she was taken off that drug sometime before August 23. In discussing Ana's August 23 admission, Dr. Tobin testified without objection that Dr. Lora was concerned about a pulmonary embolism or infection, "[a]nd there was also a concern that [Ana] could have the

withdrawal from steroids because she had been on steroids, and that will cause many of the features as well."

¶ 53    Dr. Tobin returned to the subject of steroids when discussing a note that Dr. Hinkley left in Ana's records. Over Ochoa's objection, Dr. Tobin testified that after a scan ruled out the possibility of a pulmonary embolism, Dr. Hinkley's team "began to think that, in fact, maybe it that was because she had stopped the steroids, and when you stop the steroids, then you can have all of those symptoms. You become very sick by stopping the steroids." He explained that stopping steroids can cause a drop in blood pressure and an elevated heart rate.

¶ 54    Viewing Dr. Tobin's statements in context, we agree with defendants that Ochoa mischaracterizes his testimony. Dr. Tobin never opined that Ana's death was caused by complications from stopping steroids. Rather, based on the medical record, he offered factual context for the actions taken by Dr. Lora and Dr. Hinkley as part of the narrative of events leading up to Ana's death. As to Ana's actual cause of death, Dr. Tobin opined that she died from septic shock related to E. coli bacteremia. Because Dr. Tobin's testimony about cessation of steroids was not an opinion, the trial court did not err in overruling Ochoa's Rule 213 objection. See *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 44 (trial court properly overruled the Rule 213 objection because the testimony "was factual and not an opinion").

¶ 55                     D. Dr. Tobin's Testimony About the SIRS Criteria

¶ 56    Ochoa argues the trial court erred in permitting Dr. Tobin to bolster his opinion about the SIRS (systemic inflammatory response syndrome) criteria with hearsay opinions of other doctors. We agree, but after considering all trial testimony, Dr. Tobin's comment does not warrant reversal.

¶ 57    Ochoa elicited testimony from Dr. O'Toole that in 2016, sepsis was defined as having an infection plus meeting the SIRS criteria: hypotension, tachycardia, temperature, and white blood cell count. Subsequently, Dr. Tobin testified that he helped develop the SIRS criteria in the 1990s to identify patients suitable for clinical trials of medications for treating sepsis. He further testified that "20 years afterwards, it was realized that it was highly inappropriate *** to use [the SIRS criteria] for clinical purposes" as a way of diagnosing infection, since many of the criteria can be caused by other factors. Accordingly, "the recommendations from the panels now" are to stop using the SIRS criteria. On cross-examination, Dr. Tobin acknowledged the SIRS criteria were widely used by doctors from 1990 to 2017 to determine whether a patient was septic.

¶ 58    Ochoa argues that Dr. Tobin's testimony about "the recommendations from the panels now" was inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls within a recognized exception to the rule. *People v. Lawler*, 142 Ill.2d 548, 557 (1991). It is hearsay for an expert to bolster his opinion by testifying that other experts agree with him. *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 83 (improper for doctor to support his opinion by testifying that he and other doctors had previously reached the same conclusion in a report published in a medical journal); *People v. Prince*, 362 Ill. App. 3d 762, 776 (2005) (improper for fingerprint examiner to testify that her work was peer reviewed and verified by another researcher).

¶ 59    The only purpose of Dr. Tobin's comment about "the panels" was to show that other doctors agreed with his opinion that the SIRS criteria should not be used in a clinical context to diagnose infection. Thus, we agree with Ochoa that the court erred in allowing this remark to stand. However, viewing the trial testimony as a whole, we do not find Dr. Tobin's brief remark requires reversal. See *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire &*

*Rubber Co.*, 108 Ill. 2d 106, 115-16 (1985) (admission of hearsay did not require reversal where statements were minor and did not go to the heart of the dispute); *Lewis v. Stoval*, 272 Ill. App. 3d 467, 472 (1995) (erroneous admission of medical treatises was harmless where they were not directed toward a disputed issue in the case).

¶ 60        Although it was disputed whether Ana should have been treated with antibiotics prior to August 28, the defendant doctors' usage or non-usage of the SIRS criteria was largely collateral to this dispute. Neither of Ochoa's experts based their opinions on the SIRS criteria. Moreover, to the extent the SIRS criteria were relevant, Ochoa elicited testimony from both Dr. O'Toole and Dr. Tobin that said criteria were widely used by clinicians at the time of Ana's hospitalization and death in 2016. Under these facts, we do not find Dr. Tobin's brief comment about "the panels" was prejudicial error warranting a new trial.

¶ 61                                    E. Cumulative Testimony

¶ 62        Ochoa argues the trial court abused its discretion in allowing Dr. Tobin to present opinions that were cumulative of defendants' other experts. Among other things, Dr. Tobin echoed the testimony of Dr. Palmer and Dr. Segreti that asymptomatic bacteriuria does not require antibiotic treatment, the E. coli on July 27 was not the same as on August 27, and defendants' actions or inactions were not a contributing cause of Ana's death.

¶ 63        Allowing testimony from experts specializing in different areas of medicine is a proper exercise of the court's discretion. In *Steele*, 2013 IL App (3d) 110374, ¶ 76, the trial court properly allowed two standard-of-care experts, one in internal medicine and infectious diseases, the other in emergency care, because both areas were relevant to the case. Similarly, in *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 35, the trial court properly allowed the defendant to call different medical experts with different specialties to offer the same opinion. See also

*Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 83 (testimony of hematologist should not have precluded party from calling critical care specialist to offer the same opinion).

¶ 64        Here, the defense experts were from different medical specialties: Dr. Palmer was an internist, Dr. Segreti was an infectious disease physician, and Dr. Tobin was a critical care specialist with expertise in sepsis and septic shock. Under *Steele*, *Taylor*, and *Gulino*, we find no error in permitting Dr. Tobin's testimony, particularly where Ochoa's medical experts were also permitted to offer echoing opinions that antibiotics administered during Ana's August 12 hospital stay or on August 23 would have saved her life.

¶ 65        Ochoa nevertheless argues the court's ruling transformed "a battle of the experts into a numbers game," essentially complaining that he presented only two expert witnesses whereas the defendants had three. However, the trial court has broad discretion regarding the number of expert witnesses a party may present. *Steele*, 2013 IL App (3d) 110374, ¶ 76. We find no abuse of discretion here.

¶ 66                        F. Delay in Administering Antibiotics to Ana on August 28

¶ 67        Ochoa next argues the trial court erred in limiting his cross-examination of Dr. Palmer regarding the delay in administering antibiotics to Ana on August 28. On that day, Dr. Shung ordered antibiotics at 1:30 a.m., but they were not administered until 4:29 a.m. and 4:33 a.m. When Ochoa sought to cross-examine Dr. Palmer on this subject, the defense objected, arguing it was irrelevant to defendants' negligence, stating, "[I]f you want to make that argument, you should have sued the nurses." Ochoa's counsel argued it was relevant to causation because "everybody in this case has admitted that when you need antibiotics, the sooner they get started, the better your chances are," and the delay until 4:30 a.m. decreased Ana's chances of survival.

¶ 68         The trial court observed that although Dr. Pitchon testified in general terms that "every hour counts," no expert opined that the three-hour delay from 1:30 to 4:30 a.m. was a contributing cause of Ana's death. The court therefore limited Ochoa's cross-examination as follows: Ochoa was allowed to ask, "What's your understanding *** of when [the antibiotics] were given?" Dr. Palmer replied, "I don't remember specifically." Further examination on this subject was not permitted.

¶ 69         Ochoa argues the trial court erred in curtailing this line of questioning because it was relevant to causation. In a medical malpractice case, the plaintiff must establish proximate cause by showing that the defendant's negligence "more probably than not" caused the patient's injury. (Internal quotation marks omitted.) *Gulino*, 2015 IL App (1st) 131587, ¶ 70. The plaintiff is " 'not required to show in absolute terms that a different outcome would have occurred, as such certainty is never possible.' " *Id.* (quoting *Wodziak v. Kash*, 278 Ill. App. 3d 901, 913 (1996)). Rather, it is sufficient to establish to a reasonable degree of medical certainty that the defendant's malpractice increased the risk of harm to the patient. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 119 (1997). However, merely stating that sooner treatment "would have been better" is insufficient. (Internal quotation marks omitted.) *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 845 (2010).

¶ 70         As the trial court observed, no expert testified that the delay from 1:30 a.m. to 4:30 a.m. increased the risk of harm to Ana. Dr. Pitchon testified that at around 7 p.m. on August 27, Ana's condition progressed to severe sepsis. Antibiotic therapy "in the first few hours" had a chance to save her life, and, conversely, the "five-to-six-hour delay" led to her death. However, he did not testify that anything after 1:30 a.m. was a contributing cause of injury. Accordingly, Ochoa

failed to establish the delay after 1:30 a.m. was relevant to causation, and the trial court appropriately limited his cross of Dr. Palmer on this issue.

¶ 71                    G. Permitting the Jury to Discuss the Case Before the Close of Evidence

¶ 72        After proceedings ended on the first day of testimony, the court told the jury: "You certainly can talk to each other about what you've seen and heard, but it's important that you don't start having any kind of preliminary conclusions because there is more evidence and more testimony that is going to be coming forward that will be helpful for you making your ultimate decision." Ochoa argues this was prejudicial error that deprived him of a fair trial.

¶ 73        Ochoa forfeited this issue by failing to raise a timely objection. *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 131. Although he raised the issue in his motion for a new trial, "issues raised for the first time in a post-trial motion will not be considered." (Internal quotation marks omitted.) *Id.* ¶ 132. Forfeiture aside, Ochoa has not demonstrated any prejudice from the trial court's comments.

¶ 74        We agree with Ochoa that the court should not have made the remark. "As a rule, it is improper for jurors to discuss among themselves the case or any subject connected with the trial until all of the evidence has been presented and the case has been submitted to them after final instructions by the trial court." (Internal quotation marks omitted.) *People v. Runge*, 234 Ill. 2d 68, 128 (2009). However, our supreme court has recognized that "[i]t may *** be unrealistic to think that jurors will never comment to each other on any matter related to a trial." (Internal quotation marks omitted.) *Id.* Accordingly, "some indication of occasional and isolated discussions in the jury room prior to submission does not always warrant inquiry or remedial action." *Id.* The crucial question is whether each juror kept an open mind until the case was

submitted to the jury. *Id.* Premature deliberations will not warrant reversal unless they prejudiced a party to the extent that the party was denied a fair trial. *Id.*

¶ 75        Here, there is no indication that the jurors spoke about the case at all before the close of evidence, let alone evidence that any such hypothetical discussions would have compromised their ability to render a fair verdict. In this regard, Ochoa's failure to object was critical. In the absence of an objection, there was no investigation into any prejudice that may have resulted from the court's comment. We additionally observe that while the trial court should not have told the jury that they could talk to each other about what they saw and heard, the court also admonished jurors to keep an open mind until they heard all the evidence. Under these facts, Ochoa has not shown prejudice entitling him to a new trial.

¶ 76        Ochoa additionally argues the cumulative weight of the trial court's errors entitles him to a new trial. We disagree. The only errors we have found are (1) the admission of Dr. Tobin's hearsay statement about what "the panels now" recommend, which was a brief remark in a lengthy trial that did not bear upon the ultimate issues in the case, and (2) the trial court's comment allowing the jury to discuss the case amongst themselves, from which Ochoa has demonstrated no prejudice. Singly or together, these errors do not warrant reversal.

¶ 77                              H. Manifest Weight of the Evidence

¶ 78        Lastly, Ochoa argues the jury's verdict must be reversed as against the manifest weight of the evidence. As the trier of fact, the jury is tasked with weighing the evidence, making credibility determinations, and resolving conflicts in expert testimony. *Gulino*, 2015 IL App (1st) 131587, ¶ 74. We will not disturb the jury's verdict unless it is against the manifest weight of the evidence, which occurs only where the opposite conclusion is clearly apparent or where the

jury's findings appear to be unreasonable, arbitrary and not based on the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003).

¶ 79    As set forth above, the jury heard testimony from various qualified experts who offered differing opinions. Ochoa claims he "established" that if antibiotics had been administered by 7 p.m. on August 27, Ana "would have survived." However, the testimony of his experts on that issue was squarely contradicted by that of defendants' experts, whom the jury evidently found more credible. We cannot and will not usurp the function of the jury by substituting our judgment for theirs. *Id.* at 35-36 (rejecting defendant's claim that the verdict was against the manifest weight of the evidence where the case involved a "classic battle of the experts" in which the jury resolved the testimony in favor of plaintiff).

¶ 80                                    III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 82    Affirmed.